[No. A078736. First Dist., Div. Four. Jan. 13, 1999.]

MORRISON KNUDSEN CORPORATION et al., Plaintiffs and Respondents, v.
HANCOCK, ROTHERT & BUNSHOFT, LLP et al., Defendants and Appellants.

224

**COUNSEL**

Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., H. Mathew Moore and Daniel E. Caul for Defendants and Appellants.

Pandell & Borsuk, Pandell Law Firm, Jane Curran Pandell and Lisa G. Schlittner for Plaintiffs and Respondents.

**OPINION**

**HANLON, P. J.**—This is an appeal from a preliminary injunction preventing the law firm of Hancock, Rothert & Bunshoft (Hancock) from representing the Contra Costa Water District (District) in any dispute with Morrison Knudsen Corporation (Morrison), or Morrison's wholly owned subsidiary, Centennial Engineering, Inc. (Centennial) concerning the Vasco Road or Los Vaqueros construction projects in Livermore. The ultimate issue is whether the trial court abused its discretion in concluding that Hancock had a conflict of interest which disqualified it from undertaking this representation.

A number of difficult questions arise in analyzing the alleged conflict on the somewhat unusual facts presented. Hancock seeks to represent the District in proceedings on a cross-complaint against Centennial, and the alleged conflict stems primarily from Hancock's ongoing representation of Morrison's insurance underwriters in matters involving Morrison, rather

than from representation of Morrison itself or of Centennial. We conclude: (1) that the court could consider the information Hancock received as underwriter's counsel in determining whether there was a conflict; (2) that this information could be deemed to create a conflict if it was "substantially related" to the District's dispute with Centennial; (3) the court could reasonably find that the information was substantially related to the Centennial dispute; (4) the court could reasonably find that there was a sufficient "unity of interest" between the Centennial and Morrison to treat them as one entity for purposes of the alleged conflict; and (5) the determination that Hancock should be disqualified was not an abuse of discretion under all of the circumstances.

The order granting the motion for the preliminary injunction is therefore affirmed.

## I. BACKGROUND

The District's Los Vaqueros project involves the construction of a dam and related facilities. The Vasco Road project, which preceded construction of the dam, relocated a portion of a road which will be flooded when the dam is completed. In 1992, Centennial contracted with the District to serve as on-site construction manager, or "resident engineer," for the Vasco Road project. In 1994, Morrison contracted with the District to act as resident engineer for the Los Vaqueros project.

When the Vasco Road project was almost complete in January 1996, it was discovered that acid in the sand from the Unimin quarry, which was used as a base for the reconstructed road, was corroding metal structures in the roadway. Remedial work was required to fix the Unimin sand problem, including replacement of the sand and structures it had corroded. The District retained Hancock in February 1996 to assist with potential claims against Centennial, and against Granite Construction, the general contractor on the Vasco Road project, and others arising from the Unimin sand problem.

Hancock had never represented Centennial, but Centennial's parent, Morrison, had retained Hancock on various matters until about 1990. Beginning in the 1980's, and continuing up to the time of the District's dispute with Centennial herein, Hancock was retained by the underwriters of Morrison's primary comprehensive insurance policy to monitor the defense attorneys Morrison retained on errors and omissions claims. In its capacity as "monitoring counsel," Hancock received detailed confidential communications from Morrison's defense counsel concerning the progress of cases and Morrison's potential liability.

Hancock's Ronald Ruma advised Morrison's Edwin Apel, Jr., by letter in mid-February 1996 that the District wanted to retain Hancock and Hancock partner Robert Hendrickson in connection with the Unimin sand problem involving Centennial. The letter noted that Hancock had represented Morrison in the past, and asked that Morrison waive "any actual or potential conflict" arising from Hancock's representation of the District. The letter acknowledged that this representation would "affect" Hancock's ability to become involved on behalf of Morrison or Morrison's underwriters in any claim against Morrison's insurance arising from the District's potential claim against Centennial. Apel replied that Morrison would not waive the actual or potential conflict. However, Ruma wrote back in early March 1996 advising that Hancock had agreed to act as special counsel for the District on the Unimin sand issue, and stating that Hancock did not believe that this representation presented any ethical conflict.

Hancock, along with representatives of Centennial, Granite Construction, and other design professionals and contractors on the Vasco Road project, participated in a series of meetings on the Unimin sand problem from February to September 1996. The road was evidently being repaired during this period, and Morrison as well as Centennial participated in the remedial work.

In September 1996, Morrison and Centennial's counsel Jane Pandell wrote to Attorney Ruma at Hancock and objected to Hancock's involvement in the Unimin sand dispute as counsel for the District. From September to November 1996, letters were exchanged between Morrison and Centennial on the one hand, and the District and Hancock on the other, debating whether Hancock had a conflict of interest. During this period, the District made a formal demand on Centennial for reimbursement of costs associated with the Unimin sand problem, and proposed mediation of the Unimin sand matter among the interested parties. Centennial disputed the District's claims, but said it would agree to the mediation if Hancock withdrew from representing the District. Discussions of the conflict issue continued until early February 1997, when it appeared to Morrison and Centennial that Hancock would not cease representing the District without a court order.

In January 1997, Granite sued the District for amounts spent replacing the Unimin sand. On February 13, 1997, Morrison and Centennial filed their complaint herein against Hancock and the District seeking, among other things, to enjoin Hancock's representation of the District in connection with the Vasco Road project. Morrison and Centennial's motion for a preliminary injunction was heard in April 1997.

A declaration filed by Hancock in opposition to the motion for a preliminary injunction listed Morrison, in its capacity as construction manager for the Los Vaqueros project, along with Woodward Clyde Consultants, Tudor Engineering Company, and Bechtel Corporation, among the parties who were "potentially interested" in the Unimin sand dispute. In February 1997, the District had tendered to both Morrison and Centennial the defense of a $12.4 million claim by Pacific Gas and Electric Company (PG&E) arising from the Unimin sand problem. However, at the hearing on the preliminary injunction, the District represented that it would be asserting no Unimin sand-related claims against Morrison. By that time, the District had cross-complained against Granite, Centennial and Woodward-Clyde—but not Morrison—in the action filed by Granite.

In its order granting the motion for a preliminary injunction, the court found that, by virtue of Hancock's prior representation of Morrison and current role as monitoring counsel for Morrison's underwriters, Hancock must be presumed to possess confidential information which would be useful to the District in connection with its claim against Centennial. In the court's view, Morrison had a reasonable expectation that Hancock would not disclose confidential information it received as monitoring counsel, even though Morrison was not Hancock's client when that information was provided. The court acknowledged that Centennial was Morrison's subsidiary, and that the District was not "technically adverse" to Morrison with respect to the District's claim against Centennial. However, the court found that Morrison and Centennial had a "close relationship" for purposes of the disqualification issue because decision makers at Morrison who had past and present relationships with Hancock were likely to be involved in the Vasco Road litigation. Citing "[i]n particular" the District's tender of the PG&E claim to Morrison as well as Centennial, the court found the District to be "adverse or potentially adverse to Morrison as a practical matter" with respect to all Unimin sand issues.

## II. DISCUSSION

### A. Scope of Review

Although this appeal arises from the granting of a motion for a preliminary injunction rather than for disqualification of counsel, the parties presume and we agree that the proper scope of review is the abuse of discretion standard ordinarily applied to rulings on disqualification motions. (*Truck Ins. Exchange* v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1055 [8 Cal.Rptr.2d 228].) " 'The trial court's exercise of this discretion is

limited by the applicable legal principles and is subject to reversal when there is no reasonable basis for the action.'" (*Zador Corp.* v. *Kwan* (1995) 31 Cal.App.4th 1285, 1293 [37 Cal.Rptr.2d 754].) " '[W]e must consider the evidence in the light most favorable to the prevailing party and take into account every reasonable inference supporting the trial court's decision.'" (*Cal Pak Delivery, Inc.* v. *United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 10 [60 Cal.Rptr.2d 207].) The court's findings based on conflicting evidence are conclusive on appeal. (*Ibid.*)

### B. *Standard for Disqualification*

■ This case is "a square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases." (*William H. Raley Co.* v. *Superior Court* (1983) 149 Cal.App.3d 1042, 1049-1050, fn. 3 [197 Cal.Rptr. 232].) ■ Two such rules are potentially implicated. The first is the per se rule of disqualification which generally prevents an attorney from undertaking a representation which is adverse to a current client. (*Flatt* v. *Superior Court* (1994) 9 Cal.4th 275, 284 [36 Cal.Rptr.2d 537, 885 P.2d 950].) The attorney's duty of undivided loyalty prevents such simultaneous representation, even on matters which are wholly unrelated (*id.* at pp. 284-285), without the informed written consent of both clients (*id.* at p. 285, fn. 4). The second rule governs successive representation of clients with adverse interests. An attorney is forbidden from undertaking a representation adverse to a former client if there is a "substantial relationship" between the current and former matters. (*Id.* at p. 283.) This prohibition stems from the attorney's duty to maintain client confidences. (*Ibid.*)

■ Morrison and Centennial argue that the per se rule of disqualification applies in this case. This argument is premised on treatment of Morrison and Centennial as one entity for purposes of Hancock's alleged conflict of interest, and on the claim that Hancock is currently representing Morrison in its capacity as "monitoring counsel" for Morrison's underwriters. However, putting aside for the time being the distinction between Morrison and Centennial, the trial court found that Morrison was *not* Hancock's client when Hancock acted as monitoring counsel.

This finding was supported by substantial evidence. The evidence shows that Morrison's underwriters, not Morrison, retained Hancock to monitor the other attorneys Morrison hired to defend against insured claims. Hancock was paid for its services by the underwriters, not Morrison, and reported to the underwriters rather than Morrison. The underwriters' interests were

actually or potentially adverse to those of Morrison in at least some of the matters in which Hancock became involved. Under the circumstances, the court reasonably concluded that Hancock did not presently represent Morrison. Thus, the per se disqualification rule does not apply.

The record indicates that Hancock had previously represented Morrison itself, and that this representation included the defense of professional negligence claims. However, there is no evidence that Morrison retained Hancock on any new matters after about 1990, or that Hancock performed substantial work for Morrison thereafter. Thus, the trial court did not base its disqualification order solely on Hancock's former representation of Morrison; the order was also predicated on Hancock's work for Morrison's underwriters. The court wrote, with italics added, that "[Hancock's] prior direct representation of Morrison, *coupled with its current status as monitoring counsel for [Morrison's] underwriters*, supports the conclusion that [Hancock] has acquired substantial knowledge of the policies, attitudes and practices of [Morrison's] top management with respect to litigation of this type."

Thus, this case does not fit neatly into the former representation rule. Two issues not generally presented in former representation cases are raised here. First, could the court properly consider the information Hancock obtained as counsel for Morrison's underwriters in determining whether Hancock should be disqualified herein? Second, if the answer to the first question is "yes," was the information Hancock gained from its prior representation of Morrison and its *present* representation of Morrison's underwriters sufficiently relevant to the Unimin sand dispute to create a conflict of interest?

The parties have cited conflict of interest cases from around the country in their appellate briefs, but none have involved "monitoring" activities on behalf of a party's insurer. One of the cases states that "[w]hen an insurer retains an attorney to investigate the circumstances of a claim and the insured, pursuant to a cooperation clause in the policy, cooperates with the attorney, the attorney may not thereafter represent a third party suing the insured . . . ." (*Westinghouse Elec. Corp.* v. *Kerr-McGee Corp.* (7th Cir. 1978) 580 F.2d 1311, 1319.) This statement was dicta, however, and we have found no other case that has picked up this thread.

The most relevant case for our purposes appears to be *William H. Raley, Co.* v. *Superior Court, supra,* 149 Cal.App.3d 1042. The law firm in *Raley* sought to represent a lessor in an action on a lease. The lessee was wholly owned by a bank as trustee. The bank's board of directors or an investment

committee appointed by the board had settlement authority in actions involving the lessee. A partner in the law firm sat on the bank's board of directors and on the investment committee. The law firm had never represented the bank in trust matters or the lessee, and thus the case did not involve simultaneous or successive representation of clients with conflicting interests. (*Id.* at p. 1047, fn. 2.) The court nevertheless held that the lessee's motion to disqualify the law firm should have been granted.

 The court noted that the partner's fiduciary relationship with the lessee placed the law firm on both sides of the lawsuit, and held that the situation created a conflict of interest for the firm. (*William H. Raley, Co.* v. *Superior Court, supra,* 149 Cal.App.3d at pp. 1047-1048.) The court found that the conflict was "exacerbated by [the partner's] ongoing accessibility to confidential information about [the lessee] which may be pertinent to [the lessor's] lawsuit." (*Ibid.*) The opinion reasoned in pertinent part that a conflict of interest " '. . . may arise from an attorney's relationship with a nonclient. Such a conflict of interest may arise [1] where an attorney's relationship with a person or entity creates an expectation that the attorney owes a duty of fidelity. It may also arise [2] where the attorney has acquired confidential information in the course of such a relationship which will be, or may appear to the person or entity to be, useful in the attorney's representation in an action on behalf of a client.' " (*Id.* at p. 1047.)

 The *Raley* court was quoting at this point from a State Bar opinion interpreting former rule 5-102(B) of the State Bar Rules of Professional Conduct, which provided simply that " 'A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned.' " (*William H. Raley, Co.* v. *Superior Court, supra,* 149 Cal.App.3d at pp. 1046-1047.)[1] Although the provisions of former rule 5-102 have been amended and replaced by current rule 3-310, *Raley*'s reasoning remains good law. (*Allen* v. *Academic Games Leagues of America, Inc.* (C.D.Cal 1993) 831 F.Supp. 785, 789.)

There is no direct conflict here like the one in *Raley*. No Hancock attorneys sit on the board of directors of Morrison or Centennial, and those companies are not "asked to confront," in the words of the *Raley* case, the same law firm "in both the courtroom and the board room." (*William H. Raley, Co.* v. *Superior Court, supra,* 149 Cal.App.3d at p. 1049.) However, *Raley* stands as persuasive authority for the general proposition that an attorney's receipt of confidential information *from a nonclient* may lead to

---

[1]All further references to rules are to the Rules of Professional Conduct of the State Bar of California.

the attorney's disqualification. In this case, Morrison's declarations testified to an understanding that its communications with Hancock in Hancock's capacity as "monitoring counsel" for Morrison's underwriters would be kept confidential, even if Morrison was not Hancock's "client" in those matters. This was a reasonable expectation. Hancock's own declarations acknowledged that it treated information received from Morrison "confidentially, given the Underwriters' good faith obligations to their insured." Accordingly, we conclude on the basis of *Raley* that the court could properly take into account the confidential information Hancock received as "monitoring counsel" in determining whether Hancock should be disqualified from representing the District.

The next question is the standard to use in assessing whether that information, coupled with the information Hancock gained while representing Morrison in the 1980's, created grounds for Hancock's disqualification. As previously noted, the *Raley* court applied a broad disqualification rule, indicating that the law firm could have a conflict of interest whenever it obtained confidential information which " 'will be, or may appear to the person or entity [from whom the information was acquired] to be, useful in the attorney's representation in an action on behalf of a client.' " (*William H. Raley, Co.* v. *Superior Court, supra,* 149 Cal.App.3d at p. 1047.) However, *Raley* applied this standard in a situation akin to that of simultaneous representation, where a law firm was in effect on both sides of a lawsuit. In simultaneous representation cases the paramount consideration is the duty of loyalty (*Flatt* v. *Superior Court, supra,* 9 Cal.4th at p. 284), and *Raley* was a case where the attorney's relationship with the nonclient " 'create[d] an expectation that the attorney owe[d] a duty of *fidelity.*' " (*William H. Raley, Co.* v. *Superior Court, supra,* at p. 1047, italics added.) In such cases, a "more stringent" test for disqualification applies than in cases of successive representation. (*Flatt* v. *Superior Court, supra,* 9 Cal.4th at p. 284.)

The situation here is more analogous to one of successive representation. Unlike the law firm in *Raley*, Hancock is not on both sides of the Unimin sand dispute. Hancock previously represented Morrison, and continued to receive information about Morrison in its capacity as underwriters' counsel. While Morrison had a reasonable expectation that this information would be kept confidential, it could not expect "fidelity" from Hancock as if Hancock were an attorney sitting on its board of directors like the partner in *Raley*. Hancock's loyalty ran to its client, the underwriters, not to Morrison, and Morrison could expect that the information might be used against it to further the underwriters' interests. Hancock's duty to keep the information

confidential for other purposes stemmed from its client's duty of good faith to an insured, and thus, ultimately, from Hancock's loyalty to the underwriters, not Morrison. Like a case of successive representation, the primary consideration for the (non)client in this instance is one of confidentiality rather than loyalty. (See *Flatt* v. *Superior Court, supra,* 9 Cal.4th at pp. 283-284.)

■ We therefore conclude that the proper standard for assessing whether the information Hancock received as the underwriters' counsel disqualified it from representing the District is not the loose, "may appear to be useful" test for the information in *Raley,* but rather the "substantial relationship" test ordinarily applied in successive representation cases. (*H. F. Ahmanson & Co.* v. *Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1452 [280 Cal.Rptr. 614].)

This approach is consistent with the one used in *Analytica, Inc.* v. *NPD Research, Inc.* (7th Cir. 1983) 708 F.2d 1263, 1266-1267, to assess whether information received outside an attorney-client relationship could result in disqualification. There was some question whether the law firm in that case had previously been retained by the corporation it was now suing, or by that corporation's individual shareholders, and the opinion is relevant insofar as it held that the distinction was "irrelevant." (*Id.* at p. 1268.) Writing for the majority, Justice Posner reasoned that "[i]f [the corporation] did not retain [the law firm]—though we think it did—still it supplied [the firm] with just the kind of confidential data that it would have furnished a lawyer that it had retained; and it had a right not to see [the firm] reappear within months on the opposite side of a litigation to which that data might be highly pertinent." (*Id.* at p. 1269.)

C. *Application of the Substantial Relationship Test*

The test for a "substantial relationship" between cases entails an inquiry into " 'the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases.' " (*H. F. Ahmanson & Co.* v. *Salomon Brothers, Inc., supra,* 229 Cal.App.3d at p. 1455.) It must be shown that the information from the prior representation is "material" to the current employment. (See rule 3-310(E).) " 'As part of its review, the court should examine the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy.' " (*H. F. Ahmanson & Co.* v. *Salomon Brothers, Inc., supra,* at p. 1455.)

■ Viewed in the light most favorable to the disqualification order, the record on each of these considerations is sufficient to sustain the court's

implied finding of a substantial relationship between the Unimin sand dispute and the matters Hancock handled on behalf of Morrison and Morrison's underwriters.

As for the similarity between the factual and legal issues in the other matters and the Unimin sand case, there is no evidence that Hancock was ever involved in the defense of a negligence claim concerning the use of acidic sand. However, according to the declarations filed by Morrison and Centennial, Hancock had represented Morrison on cases involving negligent engineering and negligent construction management claims, and Hancock was currently monitoring a claim by a company called Nerco Minerals against Morrison for negligent engineering services. The liability issues in the Nerco Minerals matter included "whether [Morrison] had adequately experienced personnel on the job given the geologic complexity of the site, whether laboratory data and test results relating to soils issues were mis-analyzed by [Morrison], and whether [Morrison] adequately communicated information to [the plaintiff]." The allegations in the Unimin sand matter are similarly that Centennial received a report that the sand was "severely corrosive," but nonetheless approved its continued use in the Vasco Road project.

Hancock's declarations sought to distinguish the factual issues in the Nerco Minerals and Unimin sand cases on the ground that the soils issue in the former involved placement of a clay pad in an unstable location, whereas the soils issue in the latter was "whether corrosive sand could be used above metal culverts that pass under a roadway." However, the facts of cases are never entirely alike, and no cases would ever be "substantially related" if they could be distinguished on such narrow grounds. The court could reasonably find that there was a substantial relationship between the factual situations in the two matters. The court could also reasonably find that there was a substantial relationship between the legal issues posed in the Unimin sand dispute and other cases in which Hancock participated. The record shows that a number of Hancock's other cases, like the Unimin sand case, involved duty of care issues arising from professional services rendered in connection with construction projects.

As for the nature and extent of Hancock's involvement in Morrison's cases, the evidence established that the involvement was substantial, even in Hancock's capacity as monitoring counsel for the underwriters. The declarations averred that in those matters, attorneys at Hancock discussed litigation strategy with Morrison's officers and defense counsel, conducted defense research, and participated in settlement discussions and mediations.

Morrison personnel declared that from 1990 to 1996, they had received advice from Hancock on the "value" of cases, "the upside and downside of settlement alternatives and the financial impact both to [Morrison, its divisions and subsidiaries] and [their] underwriters under the various scenarios."

As for the final factor, there was substantial evidence that as monitoring counsel Hancock had considerable exposure to Morrison's litigation policies and strategies. Morrison's Apel declared that, "[a]s monitoring counsel, [Hancock] is privy to all of the work product of assigned defense counsel, and is entitled to and frequently requests and obtains reports from defense counsel which outline the claims asserted against [Morrison], the defenses available to [Morrison], an evaluation of the evidence obtained through discovery that might satisfy the claims and the defenses, litigation plans and a settlement evaluation." These facts were confirmed by detailed reports, filed under seal for the court's in camera review, of cases pending from 1994-1996 addressed or copied to Hancock from Morrison's defense counsel. Morrison's David Reid declared that in the course of Hancock's long-term relationship with Morrison and the underwriters, Hancock had "been privy to confidential information concerning similar matters which would be useful to [the District] in its claim against [Morrison and its divisions and subsidiaries], including the identity of all the key decision makers in the Company, the litigation philosophy of Morrison, the legal and organizational structure of [Morrison, its divisions and subsidiaries], and the financial impact of pending and existing claims against [Morrison, its divisions and subsidiaries]."

An example of Hancock's substantial involvement in Morrison's cases and close familiarity with Morrison's "key decision makers" was provided in the declaration filed by Richard Edmister, who had served as Morrison's associate general counsel for 25 years. Edmister stated that he managed litigation and potential litigation for Morrison and Centennial. His work in that capacity included formulation of litigation strategies and goals, settlement evaluation, and participation in arbitrations and mediations. Edmister would be responsible for the defense of the District's claim against Centennial, and he stated that, "[c]onsistent with my normal responsibilities . . . I will assemble and analyze documents to support [Centennial's] defense, participate in meetings, expert presentations, mediations, and trial if this matter is not resolved out of court."

Edmister indicated that he had consulted with Attorney Ruma at Hancock in 1994 and 1995 with respect to competing multimillion-dollar claims between a division of Morrison, MK Ferguson, and the United Refining

Company. Edmister had a lawsuit prepared to file against United Refining, but Ruma convinced him to mediate the dispute. At Ruma's request, Edmister attended a mediation in October 1995 which resolved the matter. "During the course of the mediation," Edmister stated, "I discussed settlement strategy with Attorney Ruma and Attorney Ruma advised me of recommendations and strategies to achieve a global resolution. During the course of the mediation, I had private caucuses with the mediator and I then discussed what went on in those private caucuses with Attorney Ruma so that we could work together to resolve the dispute in a way to protect [Morrison's] insurance program, prevent a claim against MK Ferguson, and maximize MK Ferguson's recovery from United Refining."

In January 1997 when his declaration was filed, Edmister was managing several cases, including the Nerco Minerals matter mentioned above, in which Hancock was acting as monitoring counsel, and Edmister said he felt "betrayed" when he learned that Hancock was assisting the District with the Unimin sand problem. He said that "[d]uring the pendency of the United Refining explosion matter I told [Hancock] Attorney Ruma [Morrison's] pre-litigation and litigation philosophy and shared with him my approach to handling large claims. Attorney Ruma and I spent an entire day together in mediation on the United Refining matter so he saw how I respond to and interact with an adversary (United Refining) and the mediator in such a proceeding. I would not have exchanged information or confided with the various [Hancock] attorneys over the past 4 years and discussed with them my approach to handling claims had I believed that any [Hancock] attorney could represent a client in a matter adverse to [Morrison's] interests and position."

A final factor militating in favor of a "substantial relationship" finding, and one not present in the usual successive representation case, arose from Hancock's *ongoing* work as monitoring counsel. As Morrison and Centennial's attorney noted at the hearing on the preliminary injunction, Hancock was privy by virtue of this continuing role to information about Morrison's financial condition which could be useful to a Morrison adversary. As counsel put it to the court, a monitoring attorney at Hancock could potentially report to a Hancock attorney for the District that "[Morrison] is going to have to pay out a lot of money [on a monitored claim]. This is a great time for the [D]istrict to come in, make a reasonable demand on [Morrison]. They're going to settle quickly because we've already exhausted certain amounts within their policy . . . ."

Ruma, Hancock's principal monitoring attorney, filed a declaration stating that he had specifically agreed with his partner Hendrickson, the District's

counsel, not to discuss any information received from Morrison's underwriters with Hendrickson or any of the attorneys assisting him on the Unimin sand matter. ■■ However, once the substantial relationship test is satisfied, access to confidential information "is *presumed* and disqualification of the attorney's representation . . . is mandatory; indeed, the disqualification extends vicariously to the entire firm." (*Flatt* v. *Superior Court, supra,* 9 Cal.4th at p. 283.) ■■ We conclude that the substantial relationship standard was met in this instance.

## D. *The Unity of Interests Test*

It is undisputed that Hancock had never represented Centennial, or monitored any claim against Centennial on behalf of the underwriters. By the time the court ruled on the preliminary injunction, the District had sued Centennial in connection with the Unimin sand problem, but the District had not sued Morrison and the District had advised the court that it would have no claim against Morrison in the matter. Since any conflict of interest arose solely from Hancock's dealings with Morrison, the remaining question is whether Morrison and Centennial are to be treated as separate entities for purposes of the alleged conflict.

### (1) *Record*

The court disqualified Hancock based on the "close relationship" it found between Morrison and Centennial. In support of this finding, the court cited among other things the District's tender of PG&E's $12.4 million Unimin sand claim to Morrison as well as Centennial. Although there was no document withdrawing this tender, the District argues that the tender was superseded by its representations to the court that it would be asserting no claim against Morrison.

The court also cited Hancock's relationship with the Morrison personnel who would be administering Centennial's case. The evidence confirms that as counsel for Morrison's underwriters, Hancock had ongoing communications about litigation matters with Richard Edmister and Edwin Appel, the in-house attorneys at Morrison who would be managing Centennial's defense.

The court referred also to a declaration filed by Centennial's Senior Vice-President Michael Harrington, which in the court's view showed that the District was "adverse or potentially adverse to Morrison as a practical matter with respect to the Vasco Road claim and all issues arising from the use of Unimin sand." Harrington indicated that although the District had

separate contracts with Centennial on the Vasco Road project for work on the road's relocation, and with Morrison on the Los Vaqueros project for work on the dam, pump station and pipelines, the District never treated the two entities as separate companies, and instead insisted that the two contracts be "run as one project" with "one construction management team." Thus, the District prepared a single organizational chart for construction managers under the heading "Los Vaqueros Project," which covered both Centennial's Vasco Road work and Morrison's dam work without distinguishing between the two companies or their personnel.

Harrington identified various interrelationships between Centennial and Morrison in the performance of their contracts. Harrington was an officer of Centennial, but was the "principal in charge" of all work on both contracts. Morrison's John Clark served as field project manager and team leader under both contracts. Morrison personnel reviewed and administered Centennial's contract. The District knew, Harrington said, that Centennial was under Morrison's "corporate umbrella," and that Centennial had "no independent authority to enter into contracts, pay out claims, etc., without the knowledge, approval and participation of Morrison."

Harrington said that, on more than one occasion, the District requested and Morrison agreed that Morrison personnel working on the dam could be used on the Vasco Road project. At least some of this work was on the Unimin sand problem. The District acknowledged that Morrison was "called upon to help staff Centennial's inspection duties during the remediation efforts." The District initially withheld payment for the remedial work from Morrison as well as Centennial, but eventually paid Morrison "subject to the District's retention rights under the [Morrison]-District Agreement." The parties disputed the reason for the District's change of heart with regard to Morrison's payment. The District said it paid Morrison because Morrison maintained, and the District ultimately agreed, that Morrison and Centennial were separate companies with separate contracts, and because the District concluded that Morrison, unlike Centennial, had no potential liability for the Unimin sand problem. Harrington thought the payment was made simply to manufacture a distinction between Morrison and Centennial, after the issue of Hancock's conflict was raised.

Harrington noted also that the insurance required of Morrison and Centennial under the two contracts was provided under the same policy, and that any claim against the policy under either contract would be reported to Morrison personnel with whom Hancock had an ongoing working relationship.

### (2) *Legal Authorities*

A number of authorities have considered the circumstances in which parent and subsidiary corporations may be treated as one entity under California conflict of interest rules. An ethics opinion from the American Bar Association on this subject has also been cited in this state.

 California Compendium on Professional Responsibility, Part IIA, State Bar Formal Opinion No. 1989-113 (hereafter the State Bar Opinion) of the California State Bar Standing Committee on Professional Responsibility and Conduct (State Bar Committee) addressed whether an attorney who currently represented a large, publicly held corporation could represent a party in a lawsuit against the corporation's wholly-owned subsidiary, where the attorney had never represented the subsidiary and there was no prospect that the parent would ever be made a party to the suit. The answer was "yes," subject to certain exceptions.

The State Bar Committee relied on rule 3-600(A), which provides that "[i]n representing an organization, a member shall conform his or her representation to the concept that the client is the organization itself, acting through its highest authorized officer, employee, body, or constituent over-seeing the particular engagement." The State Bar Opinion reasoned that "[a] parent corporation, even one which owns 100 percent of the stock of a subsidiary, is still, for purposes of rule 3-600, a shareholder and constituent of the corporation. Rule 3-600 makes clear that in the representation of corporations, it is the corporate entity actually represented, rather than any affiliated corporation, which is the client." (State Bar Opn., *supra*, at p. 2.) The State Bar Committee conceded that if the lawsuit against the subsidiary were successful, the outcome would have an adverse financial impact on the parent as sole shareholder. However, that impact would be indirect, and the attorney's duty of loyalty "extends only to adverse consequences on existing clients which are 'direct.' . . . [W]ell-established legal authority interpreting the duty of loyalty limits the scope of ethical inquiry to whether the other affected clients are parties to the case or transaction in which the attorney is acting." (*Id.* at p. 3.)

The State Bar Opinion identified two situations when parent and subsidiary corporations should be treated as one entity for conflict purposes. (State Bar Opn., *supra*, at p. 3.) One such instance was described under the heading "The Alter Ego Exception." (*Ibid.*) The State Bar Committee thought that "[t]he doctrine of alter ego, which has been established to avoid injustices in permitting entities or individuals to hide behind the corporate veil, provides

helpful principles in determining when affiliated corporations should be treated as the same entity for conflict purposes. When a corporation is the alter ego of another entity or has sufficient unity of interests, they should be treated as the same entity for conflict purposes. In determining whether there is a sufficient unity of interests to require an attorney to disregard separate corporate entities for conflict purposes, the attorney should evaluate the separateness of the entities involved, whether corporate formalities are observed, the extent to which each entity has distinct and independent managements and board of directors, and whether, for legal purposes, one entity could be considered the alter ego of the other." (*Ibid.*)

The other situation was described under the heading "Duties Arising from Receipt of Confidential Information from Nonclient Affiliates." (State Bar Opn., *supra*, at p. 3.) The State Bar Committee opined, in the context of its hypothetical involving a suit against a client's subsidiary, that "if the attorney has obtained confidential information directly from the nonclient subsidiary under circumstances where the subsidiary could reasonably expect that the attorney had a duty to keep such information confidential, the attorney might be precluded from acting adversely to the subsidiary in matters related to the subject on which the attorney had obtained such confidential information." (*Id.* at p. 4.) This exception was supported by the *Raley* case, among other authorities. (*Id.* at p. 3.)

The State Bar Opinion has been discussed in three published opinions which are relevant here: two federal district court opinions involving patent matters (*Teradyne, Inc.* v. *Hewlett-Packard Co.* (N.D.Cal 1991) 20 U.S.P.Q.2d 1143; *Baxter Diagnostics Inc.* v. *AVL Scientific Corp.* (C.D.Cal 1992) 798 F.Supp. 612); and one opinion from a California Court of Appeal (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court* (1997) 60 Cal.App.4th 248 [70 Cal.Rptr.2d 419]).

In the *Teradyne* case, one of the law firms that sought to represent the plaintiff Teradyne in a patent infringement action against Hewlett-Packard Company (HP) also currently represented HP's wholly owned subsidiary Apollo Computer in trademark matters. There was no allegation that, while representing Apollo, the firm obtained any confidential information about HP which could have prejudiced HP's interests in the action. Nonetheless, the court disqualified the firm based on the "identity of interest" it found between HP and Apollo. In so ruling, the court applied the State Bar Opinion even though HP had not "argued explicitly" that Apollo was its alter ego or that the case fell under "the alter ego exception . . . of the [State Bar] Opinion." (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1146.)

The *Teradyne* court found that "many of the factors cited in the [State Bar] Opinion, which indicate that corporate form should be disregarded, are present here." (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1146.) The record showed that after HP acquired Apollo, most of Apollo's operations had been " 'fully integrated into HP itself.' " (*Ibid.*) Apollo's legal work, including retention of outside counsel like the firm in question, was supervised by HP's legal department. The firm received its instructions in Apollo matters from an HP attorney, and reported directly to that attorney in those matters. All correspondence on Apollo matters was directed to and from the law firm and HP, and HP itself paid the firm for the Apollo work.

Based on "[t]he degree of connectedness between HP and Apollo, particularly the fact that all of Apollo's legal work was referred to and handled by HP's office of legal counsel," the court concluded that ". . . although HP and Apollo may be separate entities for some purposes, they are one client for purposes of the conflict rules." (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1147.) The court reasoned that "HP's control and supervision of the legal affairs of Apollo, and specifically its direct role in the retention and supervision of the work of [the law firm] as outside counsel, represents a significant identity of legal interest between Apollo and its parent HP," which was "sufficient for a finding that the two should be treated a single client for the limited purpose [of the alleged conflict of interest]." (*Id.* at p. 1146.)

In the other patent case, *Baxter Diagnostics,* a law firm sought to represent defendants in a suit filed by Baxter. The firm had previously been retained by a company that had since merged into Baxter's parent, to opine on the validity of the "parent patent and reissue applications" that led to the issuance of a patent in question in the current case, and there was a "real possibility" that the attorneys who had worked on those matters would be called as witnesses. (*Baxter Diagnostics Inc.* v. *AVL Scientific Corp., supra,* 798 F.Supp. at p. 616.) It was "quite clear" to the court that the prior representation was "substantially related" to the present case, and thus that the law firm had to be disqualified. (*Ibid.*)

The court gave short shrift to the argument that disqualification was unwarranted because Baxter and its parent were separate entities. This distinction, in the court's view, was "insignificant." (*Baxter Diagnostics Inc.* v. *AVL Scientific Corp., supra,* 798 F.Supp. at p. 616.) The court found that the companies were "inextricably intertwined" because "the injury to its holding company surely flows to Baxter." (*Ibid.*) The court relegated the

State Bar Opinion to a footnote, stating that "[e]ven if this non-binding opinion stood for the proposition that an attorney could represent a third party in a lawsuit against a subsidiary of a former client on a substantially related matter, such representation could only occur if the subsidiary was not the alter ego of the parent. Here, the unity of interests between Baxter and its parent are sufficient to disregard the separate corporate entities for conflict purposes." (*Id.* at p. 616, fn. 3.)

In the *Brooklyn Navy Yard* case, a firm which represented a subsidiary undertook a representation adverse to the parent on an unrelated matter. The trial court granted the parent's motion to disqualify the firm on the ground that there was a " 'unity of interests' " between the parent and subsidiary for conflict of interest purposes. (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 252.) The Court of Appeal issued a peremptory writ of mandate directing the trial court to vacate its ruling on the disqualification motion and reevaluate the parent-subsidiary distinction using an alter ego, rather than a "unity of interests" test.

The *Brooklyn Navy Yard* court referred extensively to the State Bar Opinion, and conceded it stated that corporations could be treated as one entity for conflict purposes if they were *either* alter egos *or* had a unity of interests. However, the court thought that the "unity of interests" standard was too uncertain to provide any useful guidance. The court noted that the alter ego doctrine had been "extensively developed in California case law," and that an alter ego finding could be made if " '(1) there is such a unity of interest that the separate personalities of the corporations no longer exist; and (2) inequitable results will follow if the corporate separateness is respected.' " (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at pp. 257-258.) The court continued:

"By contrast, the unity of interests exception adopted by the court here has no specific definition or content. All that is clear from the trial court's application of this exception is that it entails a lesser showing than that required for a finding of alter ego. Plucked from its usual place within the alter ego test, the unity of interest concept stands shorn of its accepted meaning and limitations. Vagueness is not the only problem. The unity of interests concept is potentially so broad than an exception based on it could easily subsume the rule. After all, every subsidiary shares *some* unity of interest with its parent.

"Rather than a unity of interests exception, we conclude the alter ego exception is the test the court should have applied for the conflict alleged

here. Because the scope of this exception is readily defined by existing case law, it has the important virtue of specificity. Particularly in matters of ethics, where gray areas abound, attorneys need clear rules to guide them." (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 258.)

*Brooklyn Navy Yard*'s analysis conflicts with formal ethics opinion No. 95-390 (ABA Opinion) of the American Bar Association's Committee on Professional Ethics (ABA Committee)—another authority which refers to the State Bar Opinion, and one which *Brooklyn Navy Yard* cites at various points with apparent approval.

The ABA Committee addressed "whether a lawyer who represents a corporate client may undertake a representation that is adverse to a corporate affiliate of the client in an unrelated matter, without obtaining the client's consent." (ABA Opn., *supra,* at p. 1001:259.)[2] The ABA Opinion concluded that while corporate affiliation alone did not necessarily create an attorney-client relationship, there were "particular circumstances" in which an affiliate could be considered an additional client. (*Id.* at p. 1001:261.) "This would clearly be true," the ABA Committee thought, "where one corporation is the alter ego of the other. It is not necessary, however, for one corporation to be the alter ego of the other as a matter of law in order for both to be considered clients." (*Id.* at p. 1001:265.) In support of this view, the ABA Committee cited the *Teradyne* case, and the State Bar Opinion language indicating that alter ego status was only one factor to consider " '[i]n determining whether there is a sufficient unity of interests to require an attorney to disregard separate corporate entities for conflict purposes.' " (*Ibid.*)

The ABA Committee acknowledged "[t]he fact that the corporate client wholly owns, or is wholly owned by, its affiliate does not in itself make them alter egos. However, whole ownership may well entail not merely a shared legal department but a management so intertwined that all members of the corporate family effectively operate as a single entity; and in those circumstances, representing one member of the family may effectively mean representing all the others as well. Conversely, where two corporations are related only through stock ownership, the ownership is less than a controlling interest and the lawyer has had no dealing whatever with the affiliate, there will rarely be any reason to conclude that the affiliate is the lawyer's client." (ABA Opn., *supra,* at p. 1001:265.)

---

[2]Page citations to the ABA Opinion are from the ABA/BNA Lawyers' Manual on Professional Conduct.

The ABA Committee opined that the existence of an attorney-client relationship could turn on "the nature of the lawyer's dealings with affiliates of the corporate client" (ABA Opn., *supra*, at p. 1001:264), and on what information "may have been disclosed to the lawyer, under what circumstances and with what expectations" (*ibid*). The ABA Committee thought that "even if the affiliate confiding information does not expect that the lawyer will be *representing* the affiliate," there could nonetheless be "an ethically binding obligation that the lawyer will not use the information against the interests of any member of the corporate family." (*Ibid.*)

(3) *Analysis*

The weight of the foregoing authorities supports Hancock's disqualification in this case. A number of considerations apply.

First, as previously discussed, in the course of the firm's work involving the parent corporation, it received confidential information which was substantially related to the present claim against the subsidiary. The ABA Opinion and the *Baxter Diagnostics* case suggest that this fact alone might be sufficient to preclude the firm from undertaking a representation adverse to the subsidiary's interests. The ABA Opinion addressed work for and against corporate affiliates on *unrelated* matters. (ABA Opn., *supra*, at p. 1001:259.) Thus, by the terms of the hypothetical it posed, the ABA Committee implied that if the matters involving affiliates *were* related, that relationship could justify treatment of the affiliates as one client, apart from any other circumstances. Similarly, in *Baxter Diagnostics*, an alleged distinction between affiliates was termed "insignificant" where the firm had previously represented one of the affiliates on a substantially related matter. (*Baxter Diagnostics Inc.* v. *AVL Scientific Corp., supra,* 798 F.Supp. at p. 616.)

Hancock and the District note that the confidential information in this case did not come from Centennial, and that the State Bar Opinion, in considering whether an attorney who represented a parent could bring a case against a subsidiary, mentioned receipt of confidential information from the subsidiary—but not the parent—as a potentially disqualifying factor. (State Bar Opn., *supra*, at pp. 3-4.) However, the *Baxter Diagnostics* court doubted whether the State Bar Committee meant to endorse work against a subsidiary of a former client on matters which were substantially related to the former representation, and we share that skepticism. (*Baxter Diagnostics Inc.* v. *AVL Scientific Corp., supra,* 798 F.Supp. at p. 616, fn. 3.) The State Bar Committee did not address the point, and could not be said to have opined on it one way or the other.

A second related consideration, cited in the *Teradyne* case, is that the parent in this instance controls the legal affairs of the subsidiary. (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1146; see also ABA Opn., *supra,* at p. 1001:265 [referring to affiliates with a "shared legal department"].) As previously noted, Hancock's ongoing contacts with the people at Morrison who would be managing Centennial's defense gave Hancock insight into the litigation philosophy of the District's adversary.

Unlike the firm in *Teradyne,* Hancock was retained by and reported to the parent's underwriters rather than the parent. In our view, however, it is irrelevant that the firm's relationship with the parent's legal department was something other than that of attorney-client, because Morrison gave Hancock "just the kind of confidential data that it would have furnished a lawyer that it had retained." (*Analytica, Inc.* v. *NPD Research, Inc., supra,* 708 F.2d at p. 1269.) Indeed, given that Hancock was privy to the "financial impact of pending and existing claims" against Morrison and its subsidiaries, Hancock might have gained *more* potentially relevant information as underwriter's counsel than it would have if it had continued to represent Morrison directly on some individual matters. The information Hancock was receiving could have helped in gauging when Morrison and Centennial would be inclined, financially as well as temperamentally, to settle.

A third set of considerations stems from the evidence of Morrison's participation in the construction project at issue. The State Bar Opinion, the ABA Opinion and the *Teradyne* case cite integrated operations and management personnel as factors which favor a finding that affiliates are one entity for conflict purposes. (State Bar Opn., *supra,* at p. 3; ABA Opn., *supra,* at p. 1001:265; *Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1146.) Here the record shows that Morrison personnel administered Centennial's contract, that Centennial had no contractual authority independent of Morrison, and that the District was aware of Morrison's controlling role.

Overlapping functions and personnel are particularly relevant in this case because the overlap extended to the Vasco Road project where the Unimin sand problem arose. The Vasco Road project was related to the Los Vaqueros project where Morrison acted as construction manager. Morrison personnel and Centennial personnel worked on both projects, sometimes at the District's request. Indeed, Morrison personnel participated in the remedial work caused by the Unimin sand problem. Moreover, according to Morrison and Centennial, the District insisted that they function as a single management team running both projects together as one. There was evidence that the District did not distinguish between Morrison and Centennial with

respect to performance of their contracts until it appeared that such a distinction might bear on the conflict of interest issue. Even after that issue was raised, the District addressed a demand letter on a Unimin sand claim to both Morrison and Centennial which made no distinction between those entities.

Given Morrison's participation in the Vasco Road project and in the Unimin sand remediation, its personnel could be called as witnesses in the dispute between the District and Centennial. There was also a chance that, as a result of its involvement, Morrison itself could be made a party to the Unimin sand lawsuit. The District's cross-complaint against Centennial and others was only one part of a larger multiparty case arising from the Unimin sand problem. That case was in its early stages when the court ruled on the preliminary injunction herein. There were other companies like PG&E, which apparently had not been joined in the lawsuit, asserting Unimin sand-related claims. The suit had already generated at least one cross-complaint, and it was unclear who might eventually be made parties. The District had at one point asserted a Unimin sand claim against Centennial and Morrison jointly. Presumably, other claimants might do so as well.

The record thus supports the trial court's finding that the District was at least "potentially adverse" to Morrison as well as Centennial with respect to Unimin sand issues. While the mere possibility that affiliates might be joined in a lawsuit might not alone be sufficient to treat them as one entity for conflict purposes, it is another relevant factor worthy of consideration. We note in this regard that the State Bar Opinion distinguished between representation of affiliates where an attorney sought to represent a claimant against a client's subsidiary, and there was *"no prospect"* that the client would be made a party to the suit. (State Bar Opn., *supra*, at p. 1, italics added.)

Finally, there is the fact that Morrison and Centennial's services on the Vasco Road and Los Vaqueros projects were covered by the same insurance policy. Hancock submitted a declaration calling it "highly doubtful that [the] Underwriters [it represented] issued the primary insurance required of Centennial by the District." However, claims against Centennial or Morrison on both projects were administered by Morrison personnel with whom Hancock had ongoing contact as underwriters' counsel.

In light of all of the foregoing considerations, the trial court could reasonably find that Morrison and Centennial were, in the court's word, "closely" enough related to be treated as one entity for purposes of the

conflict herein. Thus, the fact that Hancock's conflict arose from its relationships with Morrison and Morrison's underwriters rather than Centennial did not prevent Hancock's disqualification from a representation adverse to Centennial in the Unimin sand dispute. Although the trial court did not expressly adopt the "unity" or "identity" of interests test applied in the State Bar Opinion and the *Teradyne* case, the court's reasoning and conclusion on the record herein were consistent with the standards set forth in those authorities and the similar standards articulated in the ABA Opinion.

The District and Hancock argue that a different conclusion is compelled because the court did not find that Centennial and Morrison were alter egos. This argument is based on the *Brooklyn Navy Yard* case, which alone among the relevant authorities holds "that only in those limited circumstances where one corporation is the alter ego of the other should parent and subsidiary corporations be treated as the same entity for conflict purposes." (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 253.)

Centennial and Morrison do not claim to be alter egos, and the question is whether the absence of such a relationship is dispositive. We conclude that it is not, and decline to follow the holding in *Brooklyn Navy Yard*.

The conflict issue in *Brooklyn Navy Yard* was whether a firm should be disqualified from representing the defendant in a dispute over a construction project in New York because it had represented affiliates and subsidiaries of one of the plaintiffs in various matters in Russia. All of the Russian matters were concluded except for one construction case involving a subsidiary, and all of those matters were "concededly unrelated" to the New York case. (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 251.) The plaintiff parent's motion for disqualification was granted based on a finding that there was a " 'unity of interests' " between the parent and the current subsidiary client of the firm. (*Id.* at p. 252.) It is not apparent from the *Brooklyn Navy Yard* opinion what analysis the trial court undertook in making this finding. According to the opinion, "[a]ll that is clear from the trial court's application of [the unity of interests] exception is that it entails a lesser showing than that required for a finding of alter ego." (*Id.* at p. 258.)

The facts in *Brooklyn Navy Yard* are distinguishable from those presented here. Here, among other things, the law firm has received information from the parent which is substantially related to the case against the subsidiary, and the parent and subsidiary are both involved in the project at issue. A

conclusory "unity of interests" finding on the facts in *Brooklyn Navy Yard* could have constituted an abuse of discretion. Our disagreement with the case is not with its result.

The *Brooklyn Navy Yard* court adopted the "alter ego" test as the sole standard for equating corporate affiliates in conflict cases in part because it thought that a "unity of interests" test was too vague. All the opinion specifically criticized, however, was "the unity of interests exception *adopted by the* [trial] *court here.*" (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 258, italics added.) It appeared that the trial court's standard had "no specific definition or content" apart from requiring something less than a finding of alter ego. (*Ibid.*) We would agree that such a purported standard is untenable; a standard with no articulable basis is no standard at all. But it does not follow from the flawed disqualification order in *Brooklyn Navy Yard* that the alter ego test is the best or only one to use in assessing corporate affiliations for conflict purposes.

The *Brooklyn Navy Yard* court held that the alter ego test was appropriate because it had been "readily defined by existing case law" and thus had "the important virtue of specificity." (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra,* 60 Cal.App.4th at p. 258.) In the court's view, "clear rules" were especially important for attorneys in ethical matters "where gray areas abound." (*Ibid.*) However, while we can empathize with the court's desire for clarity in this difficult area, we have a number of problems with its proposed solution. The alter ego test is something less than the bright-line standard the court envisioned. It was not developed to deal with conflict issues and in our view it does not work very well in conflicts cases. It involves many considerations which are irrelevant in conflicts cases, and omits others which may be highly relevant. Thus, while the test may be one standard among others for judging corporate relationships in conflicts cases, we do not think it can properly be viewed as the *sole* standard.

The alter ego test encompasses a host of factors: "[1] [c]ommingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses . . . . ; [2] the treatment by an individual of the assets of the corporation as his own . . . . ; [3] the failure to obtain authority to issue stock or to subscribe to or issue the same . . . . ; [4] the holding out by an individual that he is personally liable for the debts of the corporation . . . . ; the failure to maintain minutes or adequate corporate records, and the

confusion of the records of the separate entities . . . ; [5] the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family . . . ; [6] the use of the same office or business location; the employment of the same employees and/or attorney . . . ; [7] the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization . . . ; [8] the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation . . . ; [9] the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities . . . ; [10] the disregard of legal formalities and the failure to maintain arm's length relationships among related entities . . . ; [11] the use of the corporate entity to procure labor, services or merchandise for another person or entity . . . ; [12] the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another . . . ; [13] the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions . . . ; [14] and the formation and use of a corporation to transfer to it the existing liability of another person or entity." (*Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838-840 [26 Cal.Rptr. 806], numbers added and citations omitted.)

This long list of factors is not exhaustive. The enumerated factors may be considered "[a]mong" others "under the particular circumstances of each case." (*Associated Vendors, Inc.* v. *Oakland Meat Co., supra,* 210 Cal.App.2d at p. 838.) Several of the factors are usually present when an alter ego finding is made. (*Id.* at p. 840.) The issue turns on equitable considerations and is one of fact. (*Id.* at p. 837.) " '[T]he conditions under which the corporate entity may be disregarded, or the corporation be regarded as the alter ego of the stockholders, necessarily vary according to the circumstances in each case inasmuch as the doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court. Only general rules may be laid down for guidance.' " (*Id.* at pp. 836-837, italics omitted.) Thus, while there may be reasons to adopt the alter ego test as the sole standard in conflicts cases, promoting predictibility is not one of them.

Many of the factors used to determine whether corporations are alter egos may have little or no bearing on whether they should be treated as one entity

for purposes of attorney conflicts of interest. Undercapitalization, for example, is viewed as a "highly relevant factor" in alter ego cases (2 Ballentine & Sterling, Cal. Corporation Laws (4th ed. 1998) § 297.02), but is not emphasized in any of the conflict of interest authorities. Undercapitalization, financial misrepresentation, commingling of assets and the like are important in alter ego cases because the alter ego rules were developed primarily for the protection of creditors. (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 14, p. 527.) Such considerations, however, are not at the heart of the problem when the issue is whether the corporation should be protected from its attorneys.

The alter ego doctrine, as *Brooklyn Navy Yard* acknowledged, is generally employed against, rather than by, corporations, but the court thought that corporations should be able to avail themselves of the doctrine in conflicts cases. (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra*, 60 Cal.App.4th at pp. 258-259.) California cases have, "on not very clear theories, occasionally applied the doctrine broadly to protect the interests of the shareholders or officers of the corporation." (9 Witkin, Summary of Cal. Law, *supra*, Corporations, § 23, p. 535, italics omitted.) However, corporations do not ordinarily claim to be alter egos, and if they do most of the typical alter ego factors will not apply.

Failure to observe corporate formalities, for example, is cited as a factor in alter ego cases, and it is mentioned as well in the State Bar Opinion and *Brooklyn Navy Yard* as a relevant consideration in conflicts cases. (*Brooklyn Navy Yard Cogeneration Partners* v. *Superior Court, supra*, 60 Cal.App.4th at p. 258; State Bar Opn., *supra*, at p. 3.) In the ordinary situation, where a third party seeks to pierce the corporate veil, inadequate record keeping may be some evidence that the affiliates should be treated as one entity. Presumably, however, a corporation could not create a conflict by failing, say, to keep adequate minutes. It is difficult to see how a corporation could claim any benefit from failure to observe corporate formalities. The same would be true of undercapitalization and most of the other alter ego factors. To the extent they are relevant at all, they are not going to help the corporation. Corporations will thus be prejudiced in conflicts cases if they are reduced to arguing that they are alter egos.

Another reason why the alter ego test is a less than optimal solution is that it does not encompass considerations which may be central to an alleged conflict. It seems to us, for example, that where, as here, an attorney has received information from one affiliate which is substantially related to a

claim against another affiliate, the attorney should ordinarily be disqualified from advancing that claim against the other affiliate. There are other substantial factors which militate in favor of disqualification in the case before us, but this is the main consideration and it is not derived from any alter ego authority.

Even where the same factors, such as integrated management and operations, could apply in both alter ego and conflicts cases, they may warrant a different emphasis in the two contexts. We do not suppose, for example, that Centennial and Morrison could be found to be alter egos merely because the same personnel manage their litigation and some of their people collaborated on a single construction project at the owner's request. Those two factors alone, however, go a long way toward establishing a conflict of interest in this case, where the firm has substantial ongoing contact with the legal department, and the issue is whether the firm can represent the owner against one of the companies on a dispute arising from the project. As illustrated in the *Teradyne* case, it is not just an integrated management in general, but rather an integrated law department in particular, which may create a conflict. (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at pp. 1146-1147.) Something different, and in general something less, than an alter ego finding may justify the treatment of corporate affiliates as one entity for conflict purposes.

That something different is referred to in the State Bar Opinion as a "unity of interests." This formulation has been cited with approval in the *Teradyne* case and the ABA Opinion and we find no reason to depart from it here. (*Teradyne, Inc.* v. *Hewlett-Packard Co., supra,* 20 U.S.P.Q.2d at p. 1146; ABA Opn., *supra,* at p. 1001:265.) It was sufficient in this case for the trial court to apply the standards set forth in the State Bar Opinion, *Teradyne, Baxter Diagnostics,* and the ABA Opinion in ruling on Hancock's disqualification. The court did not need to make an alter ego finding to support its order. The State Bar Opinion properly lists the alter ego test as only one possible basis for equating affiliates in conflicts cases, and the ABA Opinion correctly notes that an alter ego finding is not required.

A dissent to the ABA Opinion remarked that the ABA Committee had "struggled for more than two years" to reach a consensus on the problem of corporate affiliation in conflicts cases, and expressed a concern, like the one voiced in *Brooklyn Navy Yard,* that the majority had "fail[ed] to furnish bright line guidance in th[is] complex and confused area." (ABA Opn. *supra,* at, pp. 1001:269, 1001:270.) We believe, however, that the ABA Opinion articulated a number of helpful considerations and doubt that anything more is possible.

The "unity of interests" test will continue to develop on a case-by-case basis, and take more definite and useful shape in the process. A court reviewing the "substantial relationship" test observed that the test had "undergone modifications and refinements since it was first announced." (*H. F. Ahmanson & Co.* v. *Salomon Brothers, Inc., supra*, 229 Cal.App.3d at p. 1454.) What evolved was a "pragmatic approach" (*id.* at p. 1455), which "focus[ed] less on the meaning of the words 'substantial' and 'relationship,' and look[ed] instead at the practical consequences of the attorney's representation of the former client" (*id.* at p. 1454). Similarly here, the principal focus should be the practical consequences of the attorney's relationship with the corporate family. If that relationship may give the attorney a significant practical advantage in a case against an affiliate, then the attorney can be disqualified from taking the case. There is substantial evidence of such a potential advantage in this instance, and that is as close as we can come to defining a "bottom line."

### E. *Conclusion*

This case is in one of those "gray areas" acknowledged in *Brooklyn Navy Yard*—questionable situations with no clear answers. The attorney-parent relationship was sufficiently unusual, the substantial relationship test sufficiently close, and the unity of interests test sufficiently unsettled, to give Hancock reasonable grounds for thinking that it might not have a conflict of interest. The firm nonetheless took a chance by venturing into a gray area. The chance it took was that a trier of fact, thoughtfully reviewing all of the evidence, would reasonably conclude that it had a conflict.

At one point in the carefully framed declarations herein, one side attributed to the other the remark that "the conflict question could go either way." We will assume for the sake of argument that that is true. Situations like this one calling for the exercise of considered judgment will inevitably continue to arise in matters of ethics as in others. No Olympian set of rules will eliminate them. Life is too complex.

But what may have been a difficult decision for the trial court is ultimately, by virtue of the limited scope of review, not a close one on appeal. The record shows that the court carefully weighed the situation and reached a reasonable conclusion in light of all of the evidence. There was clearly no abuse of discretion in deciding that Hancock should be disqualified.

## III. Disposition

The order granting the motion for a preliminary injunction is affirmed with costs to Morrison and Centennial.

Poché, J., and Reardon, J., concurred.