**BAXTER DIAGNOSTICS INC., Plaintiff,**

v.

**AVL SCIENTIFIC CORP.,**
**et al., Defendants.**

**AVL SCIENTIFIC CORP., Frank J.**
**Swenson et al., Counterclaimants,**

v.

**BAXTER DIAGNOSTICS INC.,**
**Counterdefendant.**

**AVL MEDICAL INSTRUMENTS,**
**A.G., Intervention–Claimant,**

v.

**BAXTER DIAGNOSTICS INC.,**
**Intervention–Defendant.**

**No. CV 91–4178 RG(Ex).**

United States District Court,
C.D. California.

July 2, 1992.

On Motion for Clarification Aug. 28, 1992.

■

Carl Kustin and John D. Carpenter of Christie, Parker & Hale, Pasadena, Cal., for plaintiff.

Roy L. Anderson of Lyon & Lyon, Los Angeles, Cal., John R. McArthur of Huntin & Williams, Raleigh, N.C., for defendants-counterclaimants and intervention-claimant.

ORDER

GADBOIS, District Judge.

INTRODUCTION

A. *Background*

Baxter Diagnostics is engaged in the manufacture and sale of medical diagnostic equipment. Baxter filed this action on August 10, 1991 against AVL Scientific Corp.,

AVL Photronics Corp., AVL Gesellschaft fur Verbrennungskraftmaschinen und Messtechechnik mbH (collectively the "AVL defendants"), and Dr. Frank Swenson. In its first amended complaint, Baxter alleges that it has expended considerable research in developing information relating to the presence and concentration of bacteria in blood. Baxter has allegedly kept this information confidential, with restrictions on its use and disclosure by all those to whom the information has become known.

Defendant Swenson, a former Baxter employee, was allegedly entrusted with certain of this confidential information. Baxter alleges that Swenson was hired by the AVL defendants with the intent and purpose of misappropriating Baxter's confidential information and of using that information for the commercial advantage of AVL in order that AVL could compete with Baxter in the field of medical diagnostic equipment. Baxter alleges upon information and belief that AVL has developed an instrument that it proposes to market to the public and that embodies Baxter's confidential information.

On February 12, 1992, the AVL defendants filed an answer and counterclaim against Baxter. The counterclaim alleges that AVL Graz, one of the AVL defendants, has developed and acquired a substantial amount of commercially valuable sensor technology, which includes the technology described in United States Reissue Patent, Patent Number Re. 31,879 (" '879 patent"). AVL further alleges that Dr. Heitzmann, a former Baxter employee, became aware of the inventions covered by the '879 patent and knew that such inventions could not be used without a license. AVL asserts on information and belief that Baxter willfully infringed the '879 patent by using the inventions covered by the

patent in its research and development relating to determining the presence and concentration of bacteria in blood, and that any alleged confidential information developed by Baxter relating to determining the presence and concentration of bacteria in blood was the result of such infringing use.

On February 18, 1992, this Court granted AVL Medical Instruments A.G. ("AVL A.G.") leave to intervene. AVL A.G. alleges that by virtue of a series of agreements, it owns the exclusive manufacturing and distribution rights to the '879 patent. It further alleges on information and belief that Baxter willfully infringed the '879 patent by using the inventions covered by the '879 patent without a license.[1]

B. *Facts Pertinent To Baxter's Motion To Disqualify Lyon & Lyon*

1. The '879 Patent

U.S. Patent No. 4,003,707 (the " '707 patent"), entitled "METHOD AND ARRANGEMENT FOR MEASURING THE CONCENTRATION OF GASES" issued on January 28, 1977 to Lubbers and Opitz, and was assigned to Max–Planck–Gesellschaft zur Forderung der Wissenschafter e.V. ("MPG"). A reissue application was sought on January 8, 1979, presumably to broaden the claims of the '707 patent. All of the claims relating to the reissue application, including the original claims covered by the '707 patent, were rejected by the Patent Office. A separate reissue application was filed on July 29, 1982, which eventually culminated with the issuance of the '879 patent on May 7, 1985.

2. Lyon & Lyon's Prior Representation of American Hospital Supply Corporation

During the mid–1980's, patent counsel at American Hospital Supply Corporation

---

1. AVL A.G. alleged a separate cause of action for infringement of a different patent—the '900 patent. This Court previously dismissed that cause of action but granted AVL A.G. leave to file a second amended complaint joining AVL Graz and Minnesota Mining and Manufacturing Co. as parties in intervention. Alternatively, this Court directed AVL A.G. to obtain a written waiver from AVL Graz or Minnesota Mining authorizing AVL A.G. to maintain its suit

against Baxter for infringement of the '900 patent and waiving any and all claims against Baxter for infringement of the '900 patent arising out of the same set of facts and circumstances for which AVL A.G.'s Amended Complaint in Intervention was brought.

AVL A.G. has failed to satisfy either of these alternatives. Accordingly, the Court dismisses AVL A.G.'s second cause of action for infringement of the '900 patent.

("AHS") were interested in the '707 patent and the reissue applications that eventually culminated in the '879 patent. In June of 1984, AHS retained Lyon & Lyon to prepare opinions concerning the validity of several patents, including the '707 patent. In July of 1984, Coe Bloomberg of Lyon & Lyon's Los Angeles office prepared an initial report in which he analyzed the validity of the '707 patent. In November of 1984, James Brooks, then with Lyon & Lyon's Washington, D.C. office, prepared a Supplemental Report that took into account the reissue applications. Mr. Brooks sent additional material and opinion of counsel in April of 1985.[2]

### 3. The Relationship Between Baxter and AHS

On November 25, 1985, American Hospital Supply Corporation ("AHS") merged with Baxter Travenol Laboratories, Inc. In 1988, Baxter Travenol Laboratories, Inc. changed its corporate name to Baxter International, Inc.. Baxter Diagnostics, Inc., the plaintiff herein, is a wholly-owned subsidiary of Baxter International, Inc..

## ANALYSIS

### A. *Baxter's Motion To Disqualify Lyon & Lyon*

#### 1. Baxter's Contentions

Baxter contends that Lyon & Lyon may not represent the AVL defendants/counterclaimants or the AVL A.G. intervenors in their claims against Baxter for infringement of the '879 patent because two of Lyon & Lyon's attorneys, at the request of AHS (who merged with Baxter's parent company), previously opined on the validity of the '707 patent (the parent to '879) and the reissue applications that led to the issuance of the '879 patent. Baxter asserts that the validity of the '879 patent is a key issue in this dispute. Baxter emphasizes that disqualification is especially appropriate here because Bloomberg and Brooks "almost certainly will be called as witnesses in this lawsuit, both to prove the invalidi-

ty and unenforceability of the fraudulently obtained '879 patent and to disprove the AVL defendants' contention that Baxter willfully infringed this fraudulent patent."

#### 2. Lyon & Lyon's Contentions

Lyon & Lyon responds that Baxter and Baxter International (with whom AHS merged) are separate corporate entities and that Baxter has made no showing that it is entitled to assert the prior representation of Baxter International as a basis for disqualification. Even if Baxter is so entitled, Lyon & Lyon emphasizes that Bloomberg and Brooks have not had any involvement in this litigation. Lyon & Lyon suggest that because of the substantial hardship that would accrue to the AVL defendants should Lyon & Lyon be disqualified, the lack of involvement of Brooks and Bloomberg, and the length of time that has passed since the prior representation of a distinct corporate entity, this Court, if it determines that some action is necessary, should only impose a restrictive protective order that would insure that no information concerning this action is passed to Bloomberg and Brooks and that no information concerning their prior representation is passed to the attorneys working on this matter. Lyon & Lyon also speculates that bifurcation or dismissal of certain claims would sufficiently cure any alleged impropriety.

#### 3. Resolution

The Central District has adopted the Rules of Professional Conduct for the State of California. *See* Local Rule 2.5.1. California Rule of Professional Conduct 3–310(D) provides:

> A member shall not accept employment adverse to a client or former client where, by reason of representation of the client or former client, the member has obtained confidential information material to the employment except with the informed written consent of the client or former client.

---

**2.** Mr. Brooks has since returned to Lyon & Lyon's Los Angeles office. Baxter alleges on

information and belief that both Bloomberg and Brooks are now partners at Lyon & Lyon.

■ An attorney will be disqualified from representing his current client against his former client if the former representation is "substantially related" to the current representation. *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980).

> The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all its dimensions. It is necessary to preserve the value attached to the relationship both by the attorney and by the client. These objectives require a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one. Substantiality is present if the factual contexts of the two representations are similar or related.

*Id.*

■ It is quite clear that the former representation by Bloomberg and Brooks is substantially related to the current representation. In the current representation, AVL contends that Baxter infringed the '879 patent. In the prior representation, Bloomberg and Brooks opined on the validity of '879's parent patent and the reissue applications that ultimately led to the issuance of the '879 patent. The validity of the '879 patent will be an issue in this litigation, and indeed, a real possibility exists that Bloomberg and Brooks will be called to testify on that issue. Thus, Bloomberg and Brooks must be disqualified from undertaking the current representation.

■ The disqualification of one attorney, moreover, infects the entire firm. *Id.* at 999. This is true even if the disqualified attorney has not shared any confidential information with members of the firm. *Id.* Thus, the disqualification of Bloomberg and Brooks mandates that this Court also disqualify Lyon & Lyon.

■ The arguments and proposals by Lyon & Lyon do not warrant any other conclusion. It is insignificant that Baxter is a wholly-owned subsidiary of Baxter International (with whom AHS merged). As Baxter notes, this argument exalts substance over form. Baxter is inextricably intertwined with its parent holding company and, notwithstanding the lack of a strict attorney-client relationship between Baxter and Lyon & Lyon, the injury to its holding company surely flows to Baxter. *See Trone,* 621 F.2d at 1002 ("Fiduciary obligations and professional responsibilities may warrant disqualification of counsel in appropriate cases even in the absence of a strict contractual attorney-client relationship").[3]

The Court must also disregard the various remedial suggestions advanced by Lyon & Lyon (i.e., Chinese Wall, bifurcation, dismissal). The law in the Ninth Circuit in this situation is unwavering: once an individual attorney is disqualified, the entire firm must also be removed. Thus, the Court must impose nothing short of disqualification. Accordingly, Baxter's motion to disqualify Lyon & Lyon is granted.

---

**3.** Lyon & Lyon rely on an ethical opinion by the Standing Committee of Professional Responsibility and Conduct of the State Bar of California, which discusses the following issue:

> **Issue:** Is it ethically permissible for an attorney to undertake a representation adverse to a wholly-owned subsidiary of an existing corporate client?
> **Digest:** As long as the attorney does not represent the subsidiary, it is ethically permissible to undertake such a representation, provided that the parent is not the alter ego of the subsidiary and the subsidiary has imparted no confidential information to the attorney with the reasonable expectation that the information would not be used adversely to the subsidiary.

State Bar of California Standing Committee On Professional Responsibility and Conduct, Formal Op. 1989-113 (1990).

> This opinion deals only with the situation in which an attorney, while representing an *existing* parent company, is asked by a third party to represent it against the parent's subsidiary on any matter. Even if this non-binding opinion stood for the proposition that an attorney could represent a third party in a lawsuit against a subsidiary of a former client on a substantially related matter, such representation could only occur if the subsidiary was not the alter ego of the parent. Here, the unity of interests between Baxter and its parent are sufficient to disregard the separate corporate entities for conflict purposes.

**B. *Baxter's Motion For Summary Judgment***

Baxter requests that this Court summarily adjudicate that it is not liable for infringement either on the basis that its alleged activities constitute an exception to infringement under 35 U.S.C. § 271(e)(1) or on the basis that its activities are *de minimis.*

**1. Baxter's Alleged Infringing Activities**

Baxter has been experimenting with and developing a "blood culture" instrument and method that utilizes an optical sensor to determine the presence and concentration of bacteria in blood. *See* Declaration of Michael Bucklo at ¶ 4. One of the experimental optical sensors utilized AVL patented technology. *Id.* Indeed, Michael Bucklo, Corporate Counsel and Assistant Secretary for Baxter, admitted to the use of AVL patented technology in a letter to AVL.[4] *See* Bucklo Declaration, Exhibit 1.

Before Baxter can offer any new product for sale to the public, it must pass through the following phases:

a. **The Feasibility Phase**—where the technology for the proposed new product is evaluated by a series of well-defined experiments;

b. **The Applied Research Phase**—where after having passed the feasibility phase, a prototype of the new product is constructed;

c. **The Development Phase**—where one or more pre-production instruments are constructed and used in clinical trials to produce data for submission and approval by the FDA; and

d. **The Market Introduction Phase**—where, if FDA approval is received, a product is constructed and offered for sale to the public on a limited basis.

*See* Declaration of James H. Godsey, Ph.D. at ¶ 10. According to Baxter, the development of the blood culture instrument that utilized the AVL patented technology never progressed beyond the feasibility phase. *Id.* at ¶ 11.

**2. The Development–of–Data Exception To Patent Infringement**

A person who makes, uses, or sells a patented invention during the patent term [17 years] without the authorization of the patent owner infringes the patent. 35 U.S.C. § 271(a). If, however, the patented invention is used "solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs ...," then no infringement occurs. 35 U.S.C. § 271(e)(1). Baxter asserts that its activities fall squarely under this exception.

Prior to the enactment of 35 U.S.C. § 271(e)(1), the Federal Circuit addressed "whether it was an infringing use ... for a nonlicensee to use a patented drug product ... for purposes strictly related to obtaining FDA approval for a generic substitute intended to be sold only after the patent expires." *Eli Lilly & Co. v. Medtronic, Inc.*, 872 F.2d 402, 404 (Fed.Cir.1989) (citing *Roche Products Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858 (Fed.Cir.), *cert. denied*, 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984)), *aff'd*, 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990). The Federal Circuit court concluded that "such use did not fall within any established experimental use exception and declined to extend or create an experimental use exception for FDA testing." *Id.* at 404 (citing *Roche*, 733 F.2d at 865).

As a result of the *Roche* decision, the generic drug manufacturers appealed to Congress to amend the patent laws. *Id.* at 404. They urged that the time necessary to obtain FDA approval for their generic substitutes granted a *de facto* extension of

---

**4.** Although the letter primarily discussed the employment agreement and consequent obligations of Dr. Swenson, Bucklo also stated:

Dr. Swenson was responsible for management of all new product projects while they were in either the feasibility or applied research phases of development. Among those was a blood culture instrument project which was on-going at the time of his hire at [Baxter]. *As you are aware, this project focused on the development of a fluorescent CO2 sensor which utilized, in part, AVL patented technology.*
(emphasis added).

the patent period to the patent holder and deprived the public of the ability to obtain low cost generic drugs as soon as possible. *Id.* at 405. They desired Congressional authorization to use the patented product without a license for the sole purpose of developing regulatory data prior to the expiration of the patent so they could market their generic substitutes immediately after the patent's expiration. *Id.* at 405.

At the same time, the proprietary drug interests sought to extend the patent term for their products. *Id.* Lengthy premarket testing also justified this request. These interests posited that an inventor, who often applied for a patent immediately after a potentially useful discovery, was prevented from marketing that discovery until he could obtain FDA approval. *Id.* The testing requirements could, in some instances, consume "a number of years at the beginning of the patent term and effectively reduce the patentee's time for exclusive commercial exploitation of the invention." *Id.*

In response, at least partially, to these competing interests, Congress enacted the Drug Price Competition and Patent Term Restriction Act of 1984. 35 U.S.C. § 271(e)(1) responded to the needs of the generic drug manufacturers, and provides:

> It shall not be an act of infringement to make, use, or sell a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use or sale of drugs.

Initially, competing interests disputed whether this provision exempted from infringement the use of patented inventions to develop and submit information for marketing approval of *medical devices* under the Federal Food, Drug, and Cosmetic Act (FDCA). One side of the debate interpreted this provision as only governing the development of information for the premarket approval of new *drugs*. The opposing side interpreted the language as governing the development of information required to be submitted for premarket approval under *any* federal law, so long as that law contained certain provisions that regulated drugs. Under this latter interpretation, the development of information by the infringing use of a patented device, aimed solely at securing premarket approval of a medical device under the Federal Food, Drug, and Cosmetic Act, would be protected from an infringement suit. *See Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990).

In *Eli Lilly & Co. v. Medtronic,* 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990), the Supreme Court held that § 271(e)(1) *was* intended to exempt from infringement the use of any patented invention to develop data for a medical device that required premarket approval. *Eli Lilly,* 496 U.S. at 669, 110 S.Ct. at 2688, 110 L.Ed.2d at 618. In reaching this conclusion, the Court moved beyond the strictures of 35 U.S.C. § 271(e)(1) and analyzed the structure of the 1984 Act as a whole. The Court emphasized that the 1984 Act sought to eliminate the two unintended distortions of the 17 year patent term produced by the requirement that certain products must receive premarket regulatory approval. *Id.* The Court explained that 35 U.S.C. § 271(e)(1) had remedied the *de facto* extension of the patent period by allowing competing manufacturers to infringe for the purpose of developing information to submit for premarket approval during the patent period, thereby allowing them to market their products immediately after the patent term expired. *Id.* at 672, 110 S.Ct. at 2690, 110 L.Ed.2d at 620. The Court also noted that Congress had simultaneously established a patent-term extension for patents relating to certain products that were subject to lengthy regulatory delays at the beginning of the patent period. *Id.* at 670–71, 110 S.Ct. at 2689, 110 L.Ed.2d at 619 (discussing 35 U.S.C. § 156).[5] The Court then observed that Congress had included as products eligible

---

**5.** 35 U.S.C. § 156(a) provides:

The term of a patent which claims a product, a method of using a product, or a method of manufacturing a product shall be extended in accordance with this section....

for patent-term extension *"[a]ny medical device,* food additive, or color additive subject to regulation under the Federal Food, Drug and Cosmetic Act." *Id.* at 671, 110 S.Ct. at 2689, 110 L.Ed.2d at 619, (citing 35 U.S.C. § 156(f) (emphasis added)).

In finding that Congress must have intended to exempt the use of patented inventions used solely to develop data for the premarket approval of *medical devices* under § 271(e)(1), the Court found it implausible that

> Congress, being demonstrably aware of the *dual* distorting effects of regulatory approval in this entire area—dual distorting effects that were roughly offsetting, the disadvantage at the beginning of the term producing a more or less corresponding advantage at the end of the term—should choose to address both those distortions only for drug products; and for other products named in [§ 156(f)] should enact provisions which not only leave in place an anticompetitive restriction at the end of the monopoly term but simultaneously expand the monopoly term itself, thereby not only failing to eliminate but positively aggravating distortion of the 17 year patent protection.

*Id.* at 672, 110 S.Ct. at 2690, 110 L.Ed.2d at 620.[6] In other words, since Congress had provided a patent-term extension for medical devices that required pre-market approval, it must have also intended to exempt from infringement the use of any patented invention used solely to develop data for such medical devices.

The *Eli Lilly* holding and supporting rationale weigh heavy on the resolution of the instant motion. Baxter claims that its experimentation with the blood culture

medical device that utilized AVL patented technology was performed solely to evaluate the feasibility of the instrument in contemplation for generating data to submit for regulatory approval. It argues that its activities are therefore exempt under 35 U.S.C. § 271(e)(1).

■ AVL responds that Baxter's device would be, at best, a Class I medical device,[7] and argues that 35 U.S.C. § 271(e)(1) only applies to Class III medical devices.[8] The question of whether 35 U.S.C. § 271(e)(1) applies only to Class III medical devices is one of first impression.[9]

In *Eli Lilly & Co.*, the Supreme Court held that 35 U.S.C. § 271(e)(1) applied to medical devices because Congress had authorized a patent-term extension for medical devices under 35 U.S.C. § 156(f). The question facing this Court, then, is whether Congress provided for a patent-term extension for all medical devices—Class I, II or III—or whether only the holders of Class III medical devices were granted this protection. If Congress intended that only Class III medical devices should receive a patent-term extension, then, in accordance with the Supreme Court's rationale in *Eli Lilly,* Congress, by enacting 35 U.S.C. § 271(e)(1), must have only intended to exempt an infringing use that related to the development of data for the premarket approval of Class III medical device.

Products that are eligible for a patent-term extension include "any medical device ... subject to regulation under the Federal Food, Drug, and Cosmetic Act." 35 U.S.C. § 156(f)(1)(B). Such a medical device must have also "been subject to a regulatory review period before its commercial mar-

---

**6.** The Court was also persuaded by the textual harmony between § 156(f) and § 271(e)(1). Section 271(e)(1) does not govern new animal drugs or veterinary biological products. Similarly, although new animal drugs and veterinary biological products are subject to premarket approval, neither product was allowed a patent-term extension. *Eli Lilly & Co.,* 496 U.S. at 673, 110 S.Ct. at 2690, 110 L.Ed.2d at 621.

**7.** Although Baxter speculates that its device constitutes a Class II device, this distinction is not critical because neither Class I nor Class II devices must endure the pre-market regulatory

review that Class III devices must sustain. As will be discussed *infra,* it is this distinction that is critical.

**8.** Congress has distinguished between Class I, II and III medical devices in 21 U.S.C. § 360c.

**9.** AVL correctly notes that all cases bearing on this issue have dealt with Class III medical devices. *See Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990); *Intermedics, Inc. v. Ventritex, Inc.,* 775 F.Supp. 1269 (N.D.Cal.1991).

keting or use" in order to qualify for a patent-term extension. 35 U.S.C. § 156(a)(4). Congress has defined the "regulatory review period" for medical devices as follows:

The regulatory review period for a medical device is the sum of—

(i) the period beginning on the date a clinical investigation on humans involving the device was begun and ending on the date an application was initially submitted with respect to the device under [21 U.S.C. § 360e], and

(ii) the period beginning on the date an application was initially submitted with respect to the device under [21 U.S.C. § 360e] and ending on the date such application was approved under such Act or the period beginning on the date a notice of completion of a product development protocol was initially submitted under [21 U.S.C. § 360e(f)(5)] and ending on the date the protocol was declared completed under [21 U.S.C. § 360e(f)(6)].

35 U.S.C. § 156(g)(3)(B).

Thus, Congress defined the regulatory review period for medical devices by directly referencing 21 U.S.C. § 360e. 21 U.S.C. § 360e, however, details the premarket approval required for *Class III* medical devices. This Court must conclude, therefore, that—since only Class III medical devices must endure the requisite "regulatory review period"—Congress only intended to provide a patent-term extension for Class III medical devices. Although Class I or Class II devices may be subject to some limited form of premarket notification, they are not subject to the "regulatory review period" necessary for patent-term extension. Accordingly, infringing use related to the development of regulatory data for a Class I or II medical device is not protected by 35 U.S.C. § 271(e)(1). Thus, Baxter is not entitled to summary judgment on the basis that its alleged infringement is exempt under 35 U.S.C. § 271(e)(1).

### 3. The *De Minimis* Exception

■ Baxter maintains that any infringing use was *de minimis* and cannot constitute infringement. The *de minimis* exception, however, is a very narrow one that does not apply to acts of infringement committed by a business in furtherance of some commercial purpose. As described by one District Court:

[W]here it [the patented article] is made or used as an experiment, whether for the gratification of scientific tastes, or for curiosity, or for amusement, the interests of the patentee are not antagonized, the sole effect being of an intellectual character in the promotion of the employer's knowledge or the realization afforded to his mind. But if the products of the experiment are sold, or used for the convenience of the experimenter, *or if the experiments are conducted with a view to the adaptation of the invention to the experimenter's business*, the acts of making or of use are violations of the rights of the inventor and infringements of his patent.

*Pfizer, Inc. v. International Rectifier Corp*, 217 U.S.P.Q. 157, 158, 1982 WL 51039 (C.D.Cal.1982) (emphasis added); *see also Roche*, 733 F.2d at 863 ("We cannot construe the experimental use rule so broadly as to allow a violation of the patent laws in the guise of 'scientific inquiry,' when that inquiry has definite, cognizable, and not insubstantial commercial purposes.").

The Court is unpersuaded by Baxter's argument that its work on the blood culture instrument had only reached the feasibility phase and could not have had a commercial purpose. The Court finds it highly unlikely that Baxter, a company engaged in the manufacture and sale of medical devices, was merely gratifying its curiosity or scientific tastes by undertaking to develop a blood culture instrument. While the Court cannot conclusively state that Baxter's purpose was commercial, Baxter's own admission that it was contemplating premarket regulatory approval for this device creates at the very least a genuine dispute that renders summary judgment inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore denied.

### C. *Baxter's Motion To File A Second Amended Complaint*

Baxter seeks leave to file a second amended complaint, adding AVL A.G. as a defendant and alleging an additional cause of action for declaratory relief against AVL Scientific Corp., AVL Photronics Corp., AVL Graz, and AVL A.G. In that count, Baxter seeks a declaration that certain of defendants' patents and patent applications are the property of Baxter because they were allegedly derived from Baxter's confidential and trade secret information.

Federal Rule of Civil Procedure 15(a) provides:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served.... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Defendants' assertions notwithstanding, Baxter has, in the Court's view, proceeded in good faith and without unreasonable delay in seeking these amendments. Although Baxter may have suspected that the claims raised by its new cause of action existed at the time it filed its original complaint, it had a duty to make a reasonable investigation before alleging them. It has now completed that investigation and has diligently sought leave to amend. The Court therefore grants Baxter's motion for leave to file a second amended complaint.

### CONCLUSION

For the reasons stated above, the Court grants Baxter's motion to disqualify Lyon & Lyon. The Court denies Baxter's motion for summary judgment. The Court grants Baxter's motion for leave to file a second amended complaint.

IT IS SO ORDERED.

### ORDER

### ON MOTION FOR CLARIFICATION

Having considered the memoranda filed in support of and in opposition to the AVL Defendants' and AVL A.G.'s Motion For Clarification of Order, the Court hereby orders that the AVL Defendants' and AVL A.G.'s cross-motion for summary judgment that Baxter's activities do not fall within the 35 U.S.C. § 271(e)(1) infringement exception is granted.

IT IS SO ORDERED.