**CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Highlands Insurance Company (UK), Ltd., and London & Edinburgh General Insurance Company, Ltd., Petitioners,**

v.

**ARGONAUT INSURANCE COMPANY, a California corporation, Respondent.**

No. C–03–1100 EMC.

United States District Court, N.D. California.

April 21, 2003.

Kathryn C. Ashton, W. Andrew Miller, Max H. Stern, Peter J. Whalen, Hancock Rothert & Bunshoft, LLP, San Francisco, CA, for Petitioners.

Renee C. Callantine, Susan M. Popik, Chapman Popik & White, LLP, San Francisco, CA, Mitchell A. Orpett, H. Wesley Sunu, Kevin A. Titus, Tribler Orpett & Crone, P.C., Chicago, IL, for Respondent.

## ORDER GRANTING RESPONDENT'S MOTION TO DISQUALIFY
### (Docket No. 27)

CHEN, United States Magistrate Judge.

This matter came on for hearing on April 10, 2003. Peter Whalen of Hancock, Rothert & Bunshoft appeared on behalf of the Petitioners and Mitchell Orpett of Tribler Orpett & Meyer appeared on behalf of Respondent. Having considered the arguments in support of and in opposition to Argonaut Insurance Company's motion to disqualify Hancock, Rothert & Bunshoft as counsel for Certain Underwriters at Lloyd's, London, and the argument of counsel, and good cause appearing there-

for, the Court hereby GRANTS the motion.

## I. *FACTUAL BACKGROUND*

In the underlying motion in this case, Petitioners Certain Underwriters at Lloyd's, London, Highlands Insurance Company, Ltd. and London & Edinburgh General Insurance Company, Ltd. ("Certain Underwriters") seek to disqualify George Gottheimer, Jr., the neutral umpire ("Umpire") of a pending arbitration proceeding between Certain Underwriters and Argonaut Insurance Company ("Argonaut") and to vacate certain orders issued by the Umpire. Respondent Argonaut moves to dismiss, pursuant to Rule 12(b)(6), or to stay, until after the arbitration hearing, both of Certain Underwriters' motions.

The parties entered into certain reinsurance agreements ("Reinsurance Agreements") in favor of Argonaut. Certain Underwriters' Mot. to Disqualify at 3–4. The pending arbitration arose from a dispute regarding coverage under these reinsurance contracts. Argonaut had submitted claims to Certain Underwriters in the approximate amount of $2.5 million for legal expenses from an underlying coverage action between Argonaut and an alleged insured. *Id.* at 4–5. Certain Underwriters denied coverage and initiated arbitration proceedings against Argonaut on December 14, 2001. *Id.* at 5. Each party appointed a party arbitrator, and these party arbitrators nominated two candidates for the umpire position. *Id.* Mr. Gottheimer was selected as the umpire. *Id.*

At issue in this suit are two Interim Orders issued by the Umpire. Interim Order # 2 required Certain Underwriters to make an interim cash payment or post an irrevocable letter of credit in the amount of $2,535,491.32 by December 31, 2002. Interim Order # 3 imposed sanctions on

Certain Underwriters of $10,000 a day, dating back to January 17, 2003, for each day in which Certain Underwriters are not in compliance with Interim Order # 2. In the underlying on-going arbitration proceedings, Certain Underwriters are represented by the law firm of Lord Bissell & Brook.

Certain Underwriters filed an action in San Francisco Superior Court styled as a petition to disqualify the arbitration Umpire and to vacate Interim Orders # 2 and # 3. That action was removed to this Court on March 13, 2003. The law firm of Hancock, Rothert & Bunshoft ("Hancock") represents Certain Underwriters in this petition. On March 14, 2003, counsel for Argonaut wrote to Hancock, demanding that it withdraw as counsel because of conflict of interest, since Hancock previously represented and currently represents a subsidiary of Argonaut, Argonaut Northwest Insurance Company ("Argonaut NW"), in other matters. Argonaut's MPA to Disqualify; Exh. B. On March 21, 2003, Hancock responded in a letter indicating its belief that it did not believe that Argonaut was a client of Hancock because Argonaut and Argonaut NW are separate entities. *Id.* at Exh. D. Hancock also took the position that it was not treating Argonaut as a present client because neither Argonaut nor Argonaut NW were the lead underwriters in the London Market Insurers cases in which Hancock represents participating insurers. *Id.*

On April 2, 2003, Argonaut moved to disqualify Hancock as counsel for Certain Underwriters, arguing that such representation is adverse to Hancock's current representation of an Argonaut subsidiary, Argonaut NW, which should be treated as a single entity with Argonaut for conflict purposes. Argonaut's MPA to Disqualify, at 4–7. Argonaut also argues that Hancock should be disqualified based upon its

former representation of Argonaut in matters substantially related to the present litigation, which involves contract interpretation and reinsurance industry custom and practice related to asbestos bodily injury claims. *Id.* at 7–10. The Court scheduled a hearing on shortened time for April 10, 2003.

## II. *LEGAL ANALYSIS*

### A. Disqualification Generally

 The right to disqualify counsel is a discretionary exercise of the trial court's inherent powers. *Visa U.S.A., Inc. v. First Data Corp.*, 241 F.Supp.2d 1100, 1104 (N.D.Cal.2003) (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir. 1996)). Pursuant Local Rule 11, every attorney before this Court must "comply with the standards of professional conduct required of the members of the state Bar of California." N.D. Cal. Civil Local Rule 11(a)(1). Accordingly, in this matter the Court applies California law. *See e.g., Asyst Technologies v. Empak, Inc.*, 962 F.Supp. 1241, 1242 (N.D.Cal.1997); *Elan Transdermal Ltd. v. Cygnus Therapeutic Systems*, 809 F.Supp. 1383, 1387 (N.D.Cal. 1992).

 Disqualification "ultimately involves a conflict between a client's right to chosen counsel and the need to maintain ethical standards of professional responsibility." *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal.App.4th 1422, 1428, 86 Cal.Rptr.2d 20 (1999). When considering the disqualification of counsel based upon a conflict of interest, courts must consider a host of relevant factors:

> [T]he court must weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolu-

tion of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest.

*Allen v. Academic Games Leagues of America*, 831 F.Supp. 785, 789 (C.D.Cal. 1993) (citing *In re Lee G.*, 1 Cal.App.4th 17, 26, 1 Cal.Rptr.2d 375 (1991)). On the one hand, because a motion to disqualify is often tactically motivated, and can be disruptive to the litigation process, it is a drastic measure that is generally disfavored. *Visa U.S.A.*, 241 F.Supp.2d at 1104. At the same time, "the paramount concern must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar." *State Farm Mut.*, 72 Cal.App.4th at 1428, 86 Cal.Rptr.2d 20.

### B. Concurrent Representation

The starting point for analyzing this issue is Rule 3–310 of the Rules of Professional Conduct, which states:

> (C) A member shall not, without the informed written consent of each client: (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict; or (3) Represent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter.

Rules of Professional Conduct of the State Bar of California, Rule 3–310(C).

 Rule 3–310 prohibits, in the absence of each client's informed consent, concurrent representation of clients whose interests are adverse. *Flatt v. Superior Court*, 9 Cal.4th 275, 284, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994); *Truck Ins. Ex-*

*change v. Fireman's Fund Ins. Co.*, 6 Cal. App.4th 1050, 1055–56, 8 Cal.Rptr.2d 228 (1992). Simply put, an attorney (and his or her firm) cannot simultaneously represent a client in one matter while representing another party suing that same client in another matter. As noted in *Teradyne Inc. v. Hewlett–Packard Co.*, 1991 WL 239940, 20 U.S.P.Q.2d 1143 (N.D.Cal.1991), the Ninth Circuit has held that "disqualification of a law firm based upon representation of a client in a lawsuit against an existing client requires no showing of specific 'adverse effect' resulting from such representation." *Id.* 1991 WL 239940, 20 U.S.P.Q.2d at 1145 (*citing Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir.1981)). The prohibition applies even if the two matters are entirely unrelated. *Flatt*, 9 Cal.4th at 284, 36 Cal. Rptr.2d 537, 885 P.2d 950 ("Even though the simultaneous representations may have *nothing* in common, and there is *no* risk that confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless by *required.*") (emphasis in original); *see also Mindscape, Inc. v. Media Depot, Inc.*, 973 F.Supp. 1130, 1132–33 (N.D.Cal.1997).

██ The prohibition against concurrent representation of adverse parties is broader than the prohibition against successive representation of adverse parties, the latter applying only if there is a "substantial relationship" between the successive matters. *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App.4th 223, 230, 81 Cal.Rptr.2d 425 (1999). Concurrent representation is evaluated under a more stringent standard than successive representation because the former involves not only the concern of a litigant obtaining a practical advantage in the latter litigation through *e.g.* the acquisition of confidential information gained from the counsel's prior representation, but also broader duty of undivided loyalty owed to the client and public confidence in the legal profession. *Flatt*, 9 Cal.4th at 284, 36 Cal.Rptr.2d 537, 885 P.2d 950 ("The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality.") (emphasis in original); *Truck Ins. Exchange*, 6 Cal.App.4th at 1057, 8 Cal.Rptr.2d 228 ("If this duty of undivided loyalty is violated, 'public confidence in the legal profession and the judicial process is undermined.' ") (citation omitted); *Forrest v. Baeza*, 58 Cal.App.4th 65, 74, 67 Cal. Rptr.2d 857 (1997) ("The strict proscription against dual representation of clients with adverse interests thus derives from a concern with protecting the integrity of the attorney-client relationship rather than from concerns with the risk of specific acts of disloyalty or diminution of the quality of the attorney's representation.").

Argonaut argues that Hancock's current representation of Argonaut NW in pending litigation and its current representation of Certain Underwriters in the matter against its corporate parent Argonaut falls within the prohibition of Rule 3–310(C). Murray Dec. ¶¶ 6–9; Exh. A. Hancock makes two arguments in response. First, it contends that its current representation of Argonaut NW is not representation in a meaningful sense since Hancock is representing Argonaut NW only in the sense that it is representing London Market Insurers as the lead underwriter in twelve matters in which Argonaut NW is a "following market insurer" on the policies issued by London Market. Petitioners' Opposition to Motion to Disqualify, at 5–7; Whalen Dec., ¶ 4. According to Hancock, Argonaut NW is a minor and passive participant in the London Market, where the lead underwriter assumes the lion's share of responsibility for the management of claims. Petitioners' Opposition to Motion to Disqualify, at 6–7; Whalen Dec., ¶ 4;

Wilson Dec., ¶ 7; O'Neill Dec., ¶ 5; Salter Dec., ¶¶ 5–8. Second, Hancock contends Argonaut and Argonaut NW are separate corporate entities and should not be treated as a single entity for purposes of conflicts analysis. Petitioners' Opposition to Motion to Disqualify, at 9–13.

 As to the first argument, Certain Underwriters' effort to portray Argonaut NW as a insignificant participant in the London Market is unavailing. While the lead underwriter may take primary responsibility for managing a claim, counsel jointly represents all of the participants in the London Market, and not just the lead underwriter. Orpett Additional Decl. ¶¶ 2–3. Pursuant to a January 2003 agreement, the participants in the London Market clarified their "collective use of counsel" in order to "maintain Market unity and the efficiencies joint representation delivers." Orpett Additional Decl., Exh. A, at 2–4. There is no indication that the London Market in which Argonaut NW is a participant is a separate legal entity (such as a corporation) such that the attorney-client duty would flow only to the entity and not its constituents. *Cf. Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal.App.4th 223, 240, 81 Cal.Rptr.2d 425 (1999); (State Bar Opinion emphasizes that in representing an organization, the client is the organization itself such as the corporate entity, rather than an affiliated corporation). Certainly, if Hancock were to represent *e.g.* an insured

in a suit directly against Argonaut NW, the concerns and bar of Rule 3–310(C) would not be obviated simply because Argonaut NW was a "passive" client of Hancock's in Hancock's representation of the London Market. It is a client nonetheless.[1]

 Thus, the critical issue centers on Hancock's second argument that Argonaut and Argonaut NW are separate entities and should be treated as such. Determining whether Hancock should be disqualified for representing a party "whose interest in the first matter is adverse to the client in the first matter" (Rule 3–310(C)) requires analysis of whether the parent corporation (Argonaut) and its subsidiary (Argonaut NW) should be considered a single entity for conflict of interest purposes. There are only a handful of cases applying California law to this question. *See Morrison Knudsen*, 69 Cal.App.4th at 223, 81 Cal.Rptr.2d 425; *Brooklyn Navy Yard Cogeneration Partners v. Superior Court*, 60 Cal.App.4th 248, 70 Cal.Rptr.2d 419 (1997); *Baxter Diagnostics Inc. v. AVL Scientific Corp.* 798 F.Supp. 612, 616 n. 3 (C.D.Cal.1992); *Teradyne*, 1991 WL 239940, 20 U.S.P.Q.2d at 1143.

California law recognizes that a parent corporation and its subsidiary, even if wholly owned, are generally regarded as separate entities for conflicts purposes, unless an exception applies—where the relationship between the entities are such they

---

1. Where there is an express agreement for representation, the duty flows to all parties to the agreement. Here, Argonaut has provided the London Market document which indicates an express contract for joint representation. *See* Orpett Additional Decl., Exh. A, at 2–4. *See also Responsible Citizens v. Superior Court*, 16 Cal.App.4th at 1717, 1732, 20 Cal. Rptr.2d 756 (1993) (when there is an express agreement to represent individual partners "application of the conflict of interest rules follows as of course."). Moreover, even in the absence of a contract, representation of

*e.g.* a partnership (to which the London Market is akin) may be deemed to extend, by way of implied contract, to individual partners under on the totality of the circumstances. *Responsible Citizens*, 16 Cal.App.4th at 1733, 20 Cal.Rptr.2d 756 (1993). One of the "most important facts" in this analysis is "the expectation of the client based on how the situation appears to a reasonable person in the client's position." *Id.* Absent Argonaut NW's opting out of Hancock's representation, it had a reasonable expectation that Hancock would represent it along with the other participants.

have a "unity of interests" so as to deserve being treated as one. *Morrison Knudsen,* 69 Cal.App.4th at 243, 81 Cal.Rptr.2d 425. *See* Cal. State Bar Standing Comm. on Prof. Resp., Formal Opinion No.1989–113 (1989), *available at* 1989 WL 253261 (hereinafter "State Bar Opinion"); American Bar Ass'n Comm. on Prof. Ethics, Formal Opinion 95–390 (1995), *reprinted in* ABA/ BNA Lawyers Manual on Prof. Conduct Ethics Opinions 1991–95, pp. 1001:258–274 (1996) (hereinafter "ABA Opinion").[2]

The parties acknowledge that the most extensive treatment of parent-subsidiary issues currently is found in *Morrison Knudsen.*[3] In *Morrison Knudsen,* the issue was whether the Hancock firm should be barred from representing the Contra Costa Water District in any dispute with the Morrison Knudsen Corporation or its wholly owned subsidiary, Centennial Engineering, Inc. 69 Cal.App.4th at 226, 81 Cal.Rptr.2d 425. Hancock sought to represent "the District in proceedings on a cross-complaint against Centennial, and the alleged conflict stems primarily from Hancock's ongoing representation of Morrison's insurance underwriters in matters involving Morrison ..." *Id.* at 226–27, 81 Cal.Rptr.2d 425. The court found that because of Hancock's role in having been retained by the underwriters of Morrison's insurance policy to monitor the defense attorneys Morrison retained on errors and omissions claims, Hancock received detailed confidential communications from Morrison's defense counsel about the progress of cases. *Id.* at 227, 81 Cal.Rptr.2d

425. This information could be useful in Hancock's representation of the District in litigation against its subsidiary Centennial. On the other hand, Hancock was not Morrison's counsel, but only represented Morrison's underwriter. Accordingly, while Morrison had a reasonable expectation that information obtained by Hancock would be kept confidential, it could not expect fidelity from Hancock since it was not Hancock's client. *Id.* at 233, 81 Cal. Rptr.2d 425. Because the primary consideration for the client was one of confidentiality rather than loyalty, the court concluded that the proper analytical analogy was the successive representation test of "substantial relationship." *Id.* at 234, 81 Cal.Rptr.2d 425. The court found there was a substantial relationship between the dispute between the District and Centennial and the matters Hancock handled on behalf of Morrison and Morrison's underwriters. *Id.* at 234–38, 81 Cal.Rptr.2d 425.

The court in *Morrison Knudsen* then had to determine whether there was a sufficient unity of interest between Morrison and its subsidiary, Centennial, because Hancock had never represented Centennial or monitored any claim against it on behalf of the underwriters. *Id.* at 238, 81 Cal.Rptr.2d 425. "Since any conflict of interest arose solely from Hancock's dealing with Morrison, the remaining question is whether Morrison and Centennial are to be treated as separate entities for purposes of the alleged conflict." *Id.* The Court found four factors militated in favor

2. Even though California has not adopted the American Bar Association's Model Rules of Professional Conduct ("MRPC") in its entirety, the ABA Opinion discussed in this order is germane because the relevant State Bar Opinion relies upon the MRPC as persuasive authority, as does Rule 3–600. *See* State Bar Opinion, 1989 WL 253261 *1–*3.

3. *Morrison Knudsen* rejected the traditional alter ego test in favor of the "unity of inter-

est" because the alter ego test is imported from the general law of corporations with the purpose of protecting creditors against fraud and diversion of assets and thus involved numerous factors such as undercapitalization and financial misrepresentation that have little or nothing to do with the ethical concerns that animate conflicts analysis in attorney representation. *See Morrison Knudsen,* 69 Cal.App.4th at 250–51, 81 Cal.Rptr.2d 425.

of finding a unity of interest between the two corporations: (1) Hancock had received confidential information in connection with the Morrison matter, which was substantially related to the claim against Centennial; (2) the parent corporation controlled the legal affairs of the subsidiary; (3) the parent and subsidiary had overlapping functions and personnel with respect to the construction project at issue and there was a prospect that Morrison could be joined in the suit by the District; and (4) the parent and subsidiary were covered by the same insurance policy and claims against both were administered by the parent's personnel. *Id.* at 245–47, 81 Cal.Rptr.2d 425. At bottom, the court found that the relationship gave Hancock "a significant practical advantage in a case against the affiliate" and thus should be disqualified. *Id.* at 253, 81 Cal.Rptr.2d 425.

Were the four factors of *Morrison Knudsen* to be mechanically applied to the instant case, the Court would be inclined to find against Argonaut on this motion. As noted at the hearing herein, Argonaut has not demonstrated to the Court's satisfaction that Hancock has gained any "significant practical advantage" in its representation of Certain Underwriters as a result of its representation of Argonaut NW. However, the Court is not convinced that *Morrison Knudsen* is dispositive to the case at bar. There is a fundamental difference between the two cases. As noted above, the "unity of interest" analysis in *Morrison Knudsen* was undertaken in the context of the conflict of interest claim based on the successive representation model—the focus was on the acquisition of confidential information from the parent which could be used against the subsidiary. In the instant case, the issue is whether there is a "unity of interest" in the context of a claim of concurrent representation of adverse interests. The concern in this context is not confidential information or

other practical litigation advantage obtained against an affiliate, but the "duty of undivided loyalty" owed to the affiliate. *Morrison Knudsen*, 69 Cal.App.4th at 230, 81 Cal.Rptr.2d 425; *see also State Farm Mut.*, 72 Cal.App.4th at 1431, 86 Cal. Rptr.2d 20 ("A client who learns that his or her lawyer is also representing a litigation adversary, even in a wholly unrelated matter, cannot be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship.") (citing *Flatt*, 9 Cal.4th at 285, 36 Cal.Rptr.2d 537, 885 P.2d 950).

The unity of interest analysis must be undertaken in view of the policy concerns that underlie the particular claim of conflict. *Cf. Palumbo v. Tele–Communications, Inc.*, 157 F.R.D. 129, 132 (D.D.C.1994) ("[T]he application of the rules should not be reflexive; the decision to disqualify cannot be made in a factual vacuum."). The question here, where concurrent representation is alleged, is whether there is a sufficient unity of interest between Argonaut and Argonaut NW such that Hancock's representation of Certain Underwriters in the instant case reasonably diminishes the "level of confidence and trust in counsel" held by Argonaut NW.

The Court finds that there are two factors that militate in favor of finding a reasonable basis for a diminution of such trust and confidence.

First, the financial impact of the instant litigation upon Argonaut NW is more direct than in the usual parent-subsidiary relationship. To be sure, various authorities have drawn a distinction between direct and indirect adverse consequences upon an existing client. *See* State Bar Opinion, 1989 WL 253261 at *3 ("The attorney's duty of loyalty, however, extends only to adverse consequences on existing

clients which are 'direct.' "); *see also id.* at *3 (it is only indirectly adverse if "diminution in the value of the parent's stock in the subsidiary if the attorney's suit against the subsidiary is ultimately successful."). *See also* ABA Opinion at 1001:265–67; Restatement (3d) of the Law Governing Lawyers § 121 Comment d, p. 251 (2000) (lawyer's obligation to the client extends to other entities "where financial loss or benefit to the non-client person or entity will have a direct, adverse impact on the client.").

■ Unlike the indirect stock devaluation example typical of parent-subsidiary relationships cited in the State Bar Opinion as well as the ABA Opinion (1001:265), the financial prospects of Argonaut and Argonaut NW are much more closely linked. Argonaut entered into a pooled reinsurance agreement in 1977 with Argonaut NW as well as several other regional Argonaut subsidiaries. Ijams Dec., Exh. A. Under the agreement, Argonaut and its subsidiaries pool their policies and share premiums and liabilities. Among other provisions, in addition to Argonaut reinsuring all liabilities under participating subsidiaries' policies, each subsidiary reinsures Argonaut's net liabilities in excess of reinsurance ceded to other companies. *Id.* at ¶¶ 2–3. The mutual reinsurance agreement assigns fixed percentages for the sharing of financial risks, including 87.0% for Argonaut, and 0.6% for Argonaut NW. *Id.* at ¶¶ 1, 6. The pooling agreement applies retroactively to pre-existing policies including those in which Hancock is representing the London Insurers and in which Argonaut NW is participating. Ijams Dec., ¶ 4; Murray Dec., ¶ 12. The 2002 financial statements indicate that Argonaut

NW continues to participate in the intercompany pooling arrangement. Ijams Dec., Exh. B. Since Argonaut and Argonaut NW directly share profits and losses, it follows that both could be directly affected by an adverse or favorable judgment in the underlying arbitration with Certain Underwriters. While Certain Underwriters speculate that the financial position of participants in the pooling agreement will not be affected by the matter being challenged in the instant petition (Interim Orders # 's 2 & 3), clearly if Certain Underwriters succeed in vacating the orders and/or disqualifying the Umpire, it is likely to have a substantial impact upon the course and quite possibly the outcome of the arbitration. Thus, the fact that Hancock is handling only a portion of the matter is not determinative—the petition it is prosecuting on behalf of Certain Underwriters is significant and could well have a material effect upon the underlying arbitration.[4]

Second, both of the claims—Argonaut NW's policies represented by Hancock on behalf of the London Market as well as those of Argonaut in its dispute with Certain underwriters—are managed by the same persons on behalf of both Argonaut and Argonaut NW. The operations of Argonaut and Argonaut NW are thoroughly imbricated. There is but a single claims staff, and this staff does not separately handle the liability of an Argonaut subsidiary from other Argonaut companies. Murray Dec., ¶ 14. Under the mutual reinsurance agreement, Argonaut collects all premiums and adjusts all losses on behalf of all the pooled policies. Ijams Dec., Exh. A Paragraph 4. Moreover, in addition to the centralized claims management under

---

4. The mere fact that Argonaut NW's share of the pool is relatively small is not by itself sufficient to negate the direct consequence of the instant proceedings. There is no *de minimus* exception to the duty to loyalty given that this duty safeguards "public confidence in the legal profession and the judicial process ..." *Truck Ins. Exchange,* 6 Cal.App.4th at 1057, 8 Cal.Rptr.2d 228.

the pooling agreement, there is nearly complete overlap in the management of the two corporate entities. The three officers of each of the Argonaut companies are common to all of the Argonaut companies. Ijams Dec., Exh. C (listing corporate masthead for each subsidiary); Murray Dec., ¶ 14. Each of the vice presidents in Argonaut NW are also Argonaut vice presidents. Ijams Dec., Exh. C. Argonaut has four directors or trustees, and they comprise four of the five directors or trustees for Argonaut NW. *Id.* The control group is thus common to both Argonaut affiliates. Accordingly, both the management operations and the legal affairs in the handling of claims are essentially identical for both Argonaut and Argonaut NW. This is significant because from the standpoint of the law's concern for client's "confidence and trust in counsel" (*State Farm Mut.*, 72 Cal.App.4th at 1431, 86 Cal.Rptr.2d 20), here there is, for all practical purposes, but *one* client on both sides of Hancock's representation.

In *Teradyne*, which involved a claim of concurrent representation, the court held that HP and its subsidiary should be treated as a single entity for conflicts purposes because HP controlled and supervised the legal affairs of the subsidiary, including the retention and supervision of the outside counsel. Thus, there was "a significant identity of legal interest between Apollo and its parent HP." 1991 WL 239940, 20 U.S.P.Q.2d at 1146. *See also Morrison Knudsen*, 69 Cal.App.4th at 246, 81 Cal.Rptr.2d 425 (second factor supporting finding of unity of interest was the fact that the parent corporation in this instance controlled the legal affairs of the subsidiary).

The substantial overlap in management in general and the fact that the legal affairs with respect to the claims at issue in the two cases are managed by the same group for both Argonaut and Argonaut NW, strongly suggest that treating the two as a single entity for conflicts purposes is appropriate. *See Teradyne*, 1991 WL 239940, 20 U.S.P.Q. at 1146 (court should consider "extent to which each entity has distinct and independent managements and boards of directors"). *See also* ABA Opinion at 1001:265 (representation of corporate client extends to its affiliate when "management [is] so intertwined that all members of the corporate family effectively operate as a single entity").

The resolution of the instant motion is not by any means self evident; this case constitutes another of the proverbial "square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases." *William H. Raley Co. v. Superior Court*, 149 Cal.App.3d 1042, 1049–50 n. 3, 197 Cal.Rptr. 232 (1983). The Court nonetheless concludes that the combination of the two factors—(1) the relatively direct financial relationship between Argonaut and Argonaut NW as a result of the pooling agreement and (2) the common management, including supervision over the legal affairs of both entities at issue in the two suits in which Hancock is involved—mandate the conclusion that the two should be treated as one entity for purposes of analyzing the conflict of interest in the context of concurrent representation of adverse interests. Hence, Hancock cannot, consistent with Rule 3–310, represent both Argonaut NW in the London Market matters and Certain Underwriters in the instant suit and arbitration against Argonaut.

### C. Prior Representation

Having found that Hancock is disqualified based upon concurrent representation, the Court need not reach the issue of whether Hancock's prior representation of Argonaut is substantially related to this case.

## D. Delay and Disruption

As noted above, in ruling on a motion to disqualify counsel, the Court must be mindful of numerous factors including the party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding along with the preservation of public trust in the scrupulous administration of justice and in the integrity of the bar inherent in the rules of ethics.

Certain Underwriters argues that Argonaut brings this motion to disqualify Hancock for tactical rather than substantive reasons. Petitioners' Opposition to Motion to Disqualify, at 17. For the reasons stated above, however, the Court finds Argonaut's motion to be meritorious. In addition, Argonaut was not dilatory in challenging Hancock's representation of Certain Underwriters, since Argonaut brought this motion a few weeks after Hancock took the case, and only after unsuccessfully requesting that Hancock withdraw. Argonaut's MPA to Disqualify; Exh. B.

Nor does Certain Underwriters face unfair financial and tactical burdens as a result of this disqualification order. *See Allen v. Academic Games*, 831 F.Supp. at 789. The Court ordered the motion to disqualify Hancock be heard immediately after it was filed, prior to Certain Underwriters' already scheduled motions to disqualify the arbitration Umpire and to vacate Interim Orders # 2 and # 3. Hearing and deciding the disqualification motion has not delayed hearing Certain Underwriters' motions.

Second, not only was Hancock's representation of Certain Underwriters limited to the petition to disqualify the arbitration Umpire and to vacate Interim Orders # 2 and # 3 (Hancock does not represent Certain Underwriters in the underlying arbitration proceedings), but substitute counsel designated to step in if Hancock is disqualified—the law firm of Bowles & Verna—previously stepped in to represent Certain Underwriters when Hancock withdrew from the related case of *Argonaut v. Equitas Reinsurance Ltd.* (San Francisco Superior Court Case No. 317805) in December 2001.[5] Argonaut's MPA to Disqualify, at 2–3; Exh. A. Certain Underwriters is a major client with the resources to command top-notch representation. The Court has every confidence that substitute counsel can "hit the ground running" in the present matter.

Finally, all of the supplemental briefing for the hearing on Certain Underwriters' motions have been filed. The Court issued an interim order on April 17, 2003 disqualifying Hancock (upon which this Order elaborates) after the written briefs were filed. Thus, for the April 22 hearing, replacement counsel from Bowles & Verna need only make oral argument. In summary, the Court anticipates that there will be minimal, if any, prejudice to the parties or disruption to the Court as a result of the disqualification order. *Cf. William H. Raley Co.*, 149 Cal.App.3d at 1048, 197 Cal.Rptr. 232 (courts must take into account disruptiveness in disqualification proceedings).

## III. CONCLUSION

For the reasons stated above, Hancock is disqualified from representing Petition-

---

**5.** At the April 10th hearing, Peter Whalen of the Hancock firm informed the Court that substitute counsel was standing by. In response to this Court's interim order, on April 18, 2003, Mr. Whalen informed the Court by telephone that Robert Westerfield of Bowles & Verna (Walnut Creek, CA) would be arguing on behalf of Certain Underwriters at the April 22, 2003 hearing. Westerfield was the designated substitute counsel in *Equitas*. Argonaut's MPA to Disqualify, Exh. A.

ers in this matter because, under the unity of interest test, the Petitioners interests are directly adverse to those of Argonaut, Hancock's current client in unrelated matters.

IT IS SO ORDERED.